922 F.2d 712
 Willa Dean HOWELL, Individually and as Administratrix of the
estate of Van Howell; Lisa Howell, through her
natural guardian and next friend Willa
Dean Howell and Lori Miller,
Plaintiffs-Appellees,
v.
David C. EVANS, Commissioner, Department of Corrections, et
al., Defendants,
Edward M. Mendoza, M.D., Correctional Medical Systems, Inc.,
Charles Burden, individually and as Superintendent
of Augusta Correctional and Medical
Institution, Defendants-Appellants.
 No. 89-8455.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 28, 1991.
 
 William P. Tinkler, Jr., Decatur, Ga., for Mendoza.
 Cathy A. Cox, John C. Jones, Sr. Asst. Atty. Gen., Atlanta, Ga., for Burden.
 J. Vincent Cook, Cook, Noell, Tolley & Aldridge, Athens, Ga., Patrick T. Beall, Watkinsville, Ga., for plaintiffs-appellees.
 Appeal from the United States District Court for the Southern District of Georgia.
 Before KRAVITCH and ANDERSON, Circuit Judges, and GODBOLD, Senior Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 In this section 1983 action, Willa Dean Howell seeks damages against various medical and prison officials for the death of her husband, a prison inmate, on the ground that the defendants were deliberately indifferent to her husband's health in violation of the eighth amendment. The defendants appeal the district court's denial of their summary judgment motions, asserting qualified immunity from the actions. This appeal raises issues concerning appellate jurisdiction over a denial of qualified immunity, the availability of immunity for the defendants, and the general liability of the provider of medical services under section 1983.
 
 I. BACKGROUND
 A. Facts
 
 2
 Correctional Medical Services, Inc. ("CMS") provides medical and administrative services, including physicians and other health-care professionals, at the Augusta Correctional and Medical Institution ("ACMI") under a contract with the Georgia Department of Corrections. The obligations under this contract are not assignable. CMS, however, did contract with several doctors for their services at ACMI, including Dr. Youmans and Dr. Mendoza, who had immediate treating responsibility for inmate Van Howell, and Dr. Robinson, who supervised the physicians.[1] Charles Burden was the superintendent of ACMI.
 
 
 3
 Van Howell died on January 14, 1985 while an inmate at ACMI. He had suffered severe asthma prior to entering prison, and died as a result of status asthmaticus, a serious asthma attack. There is conflicting evidence about whether Mr. Howell's condition was recognized by prison officials as terminal at the time of admission to ACMI or at any time thereafter. His condition was recognized as serious, however, because in June of 1984 Dr. Youmans, Dr. Robinson, and Burden supported Mr. Howell's application to the parole board for a medical release. Apparently this application asserted that ACMI was unable to care for Howell properly but did not assert that he was terminally ill, which also would have been a legitimate basis for release.
 
 
 4
 At the time of the release application, Dr. Youmans pointed out in a memorandum that ACMI did not have the capacity to handle many of Howell's medical needs. The facility could not provide a special diet, respiratory therapy, immunotherapy, or blood-gas testing. Over six months elapsed from the time Dr. Youmans first filed a written report of the ACMI's deficiencies regarding Howell to the date of Howell's death. In that time apparently little was done to remedy these problems, because Dr. Youmans restated the fact of the deficiencies at the time of Howell's death.
 
 
 5
 On the day of Howell's death, Dr. Mendoza was Howell's attending physician as Dr. Youmans was temporarily absent. Mendoza, however, was aware of Howell's serious condition. According to the medical records, at 9:15 a.m. Howell complained of breathing difficulty, and Dr. Mendoza ordered the administration of oxygen. It is disputed whether Mendoza saw the patient at this time. Mendoza apparently did not see the patient between that time and 12:55 p.m., although he contacted the nurses by telephone and ordered the continuation of the oxygen. Upon learning that Howell's condition persisted, Mendoza attempted to reach a doctor at the Medical College of Georgia, but was unable to do so. At 3:00 p.m. Mendoza ordered the administration of Solu-Medrol to counter the acute episode of asthma. Howell died at approximately 5:00 p.m. as a result of cardiopulmonary arrest. The record on these facts is clouded by the fact that Dr. Mendoza made several late entries onto the medical log, making it unclear precisely when he saw Howell and what he actually did.
 
 B. Procedural History
 
 6
 Howell's surviving spouse, Willa, filed an action under 42 U.S.C. Sec. 1983 alleging, inter alia, that the defendants acted with deliberate indifference toward her husband's medical needs. The defendants moved for summary judgment on the ground of qualified immunity. In support of this motion the defendants presented the affidavits of Drs. Hopkins and Mendoza. Mrs. Howell presented a response affidavit of Dr. Phillips.
 
 
 7
 The district court denied the motions for summary judgment. It held that a jury could conclude that Mendoza and Burden acted with deliberate indifference. It also concluded that the actions of Mendoza were imputed to CMS because CMS had a non-delegable contract with the prison and employed Mendoza, and therefore CMS also acted with deliberate indifference. The court, however, discussed only the standards for summary judgment as applied to the case; it did not address the issues of qualified immunity. Absent from the order was any discussion of what the clearly established law was at the time of Howell's death, an inquiry essential to a determination of immunity. Nevertheless, because the application of qualified immunity is a matter of law which we review de novo, once we determine that we have jurisdiction[2] we need not remand to obtain the district court's decision on qualified immunity.
 
 II. JURISDICTION
 
 8
 Decisions of this circuit on the issue of jurisdiction to review a denial of summary judgment based on qualified immunity are confusing. The general law, however, is well established. A court of appeals usually does not have jurisdiction over interlocutory appeals that have not been certified by the district court. See 28 U.S.C. Secs. 1291, 1292; see also Flinn v. Gordon, 775 F.2d 1551, 1552 (11th Cir.1985), cert. denied, 476 U.S. 1116, 106 S.Ct.1972, 90 L.Ed.2d 656 (1986). The Supreme Court has provided an exception to this rule for decisions that, although not terminating the action, do "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225-26, 93 L.Ed. 1528 (1949).
 
 
 9
 The Supreme Court has held that a defense of qualified immunity constitutes such a "collateral order." It reasoned that because qualified immunity embodies an entitlement to "immunity from suit rather than a mere defense to liability; and ... is effectively lost if a case is erroneously permitted to go to trial," a denial of immunity is necessarily final in effect and is an appealable collateral order. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985) (emphasis original). In this way Mitchell facilitated the goal of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), which established the current standards for qualified immunity, and sought to resolve "many insubstantial claims on summary judgment" and avoid burdening government officials with unnecessary trials or discovery motions in cases where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 817-18, 102 S.Ct. at 2737-38.
 
 
 10
 Despite the Supreme Court's holding in Mitchell that a denial of qualified immunity is appealable, the language it employed created a potential limitation on appealability. The Court stated that "a district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. Sec. 1291...." 105 S.Ct. at 2817 (emphasis added). This left open the question of appealability when an immunity claim depends not solely on legal issues but also on factual matters.
 
 
 11
 This circuit's attempts to apply Mitchell's pregnant statement have bred some confusion. Initially, in Riley v. Wainwright, 810 F.2d 1006 (11th Cir.1986), the court held that when the district court has denied summary judgment because there was insufficient "factual development" to decide whether there was a basis for immunity, the denial was not appealable. Id. at 1007. The court concluded that the denial did not turn on an issue of law, and therefore did not fit into the Mitchell analysis. Some subsequent panels have relied on Riley and Mitchell to deny jurisdiction when there exists a genuine factual dispute regarding the conduct underlying the immunity defense. See Peppers v. Coates, 887 F.2d 1493, 1496-97 & n. 7 (11th Cir.1989); Goddard v. Urrea, 847 F.2d 765, 769 (11th Cir.1988). These panels reasoned that a genuine factual dispute, like an insufficiently developed factual record, makes it impossible to determine what actions actually took place, and therefore precludes any legal conclusion on whether certain actions constituted violations of clearly established law. See Goddard at 769.
 
 
 12
 Other panels have reached the opposite conclusions regarding appealability and factual disputes.[3] In McDaniel v. Woodard, 886 F.2d 311 (11th Cir.1989), the court held that a denial of summary judgment based on a factual dispute did not preclude appellate review, because "in reviewing a qualified immunity claim we assume the facts to be as plaintiff alleges them" and then the court determines if the facts demonstrate a violation of a clearly established right. Id. at 313. Another panel also retained jurisdiction in such a situation, deciding that the determination that a factual dispute precludes summary judgment was a legal conclusion and thus reviewable. Rich v. Dollar, 841 F.2d 1558, 1561 (11th Cir.1988). Instead of denying jurisdiction, that court determined that the existence of a factual dispute goes to the merits of the qualified immunity claim. The court reasoned that regardless of whether there was a factual dispute, if the right allegedly violated was not clearly established, then the immunity should be granted. Thus the appellate analysis of the clearly established law precedes an analysis of the factual dispute. If, on the other hand, the right was clearly established, the court proceeds to analyze the facts as presented by the plaintiff and in the record, viewing such facts in the light favoring the party opposing summary judgment. If the record and presentations of the parties do demonstrate an issue of material fact regarding whether the official violated the law, then summary judgment is denied. Id. at 1564-65. It is up to the fact-finder to decide at trial whether the official violated the clearly established law.
 
 
 13
 Presented with this disparate treatment of the jurisdictional issue in the circuit, we are compelled to choose the view we find persuasive. We believe that the analysis of Rich and McDaniel conforms best to the Supreme Court precedent and the policies supporting both qualified immunity and summary judgment.[4] Harlow sought to limit a determination of qualified immunity to objective issues that could be handled as a matter of law. 102 S.Ct. at 2737-38. Mitchell then facilitated this decision by permitting interlocutory appeals. It would run counter to this policy to deny appealability any time a factual dispute arises. Indeed, according to the Goddard analysis, the court might never make the necessary determination of the clearly established law prior to trial. Harlow and Mitchell, however, demand that courts determine the clearly established law prior to trial in order to preserve the defendant's right to be free from the burdens of trial. In a situation where factual development is necessary, such development can occur through further discovery prior to trial, while still preserving the opportunity to determine the legal issues, and to appeal, before trial. In the situation of a factual dispute, however, only the fact-finder could resolve the dispute and the Harlow analysis of clearly established law would be lost. See Goddard, 847 F.2d at 770 (Johnson, J., dissenting).[5]
 
 
 14
 Applying this law to the instant case, we find that we do have jurisdiction to hear the appeal. We note that the failure of the district court to consider explicitly the qualified immunity defense makes it difficult for us to determine if the denial of summary judgment was based on a matter of law. The correct analysis would have been to determine whether the allegedly violated right was clearly established, and then to determine if, given the facts most favorable to the plaintiff, a reasonable official would have known that the alleged actions violated that right. Anderson v. Creighton, 483 U.S. 635, 642, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987); Stewart, 908 F.2d at 1502-03. In this case, however, the district court bypassed the first part of the analysis, apparently assuming that deliberate indifference was the appropriate and clearly established right, and then found, as a matter of law, that the alleged actions and factual record could support a finding that that right had been violated. The district court did not find a need for development of the record, nor do we. The qualified immunity issue is a question of law which we consider de novo, regardless of the district court's failure to do so.
 
 
 15
 Finally we reject the appellee's contention that the issues before us turn solely on factual and not legal considerations. As is discussed below, appellants contend, inter alia, that the deliberate indifference standard was not specific enough and thus that the law in 1984 was not clearly established sufficiently for a reasonable person to have known the actions alleged violated Howell's rights. This is precisely the type of issue that the court of appeals must determine at this stage of a qualified immunity defense in a section 1983 action.
 
 III. DISCUSSION
 A. Generally Applicable Law
 
 16
 As stated above, Harlow established the test for qualified immunity. Officials can claim immunity as long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 102 S.Ct. at 2738. This objective formulation requires not only a determination of the protected right, but also a decision of how particularly the right must be stated. The Court recognized the problem of specificity and subsequently stated that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson, 107 S.Ct. at 3039. The Court thus sought a balance between unnecessarily burdening officials with the responsibility of divining what a general phrase such as "due process" might require and unreasonably failing to assess liability unless the specific action had been found unlawful. Id.
 
 
 17
 It is indisputable in this case that the general right which Mrs. Howell alleges to have been violated was itself well established at the time of her husband's death. In 1976 the Supreme Court concluded that "deliberate indifference to the serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' ... proscribed by the Eighth Amendment." Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Anderson, however, requires that we decide whether this formulation of the right, along with the further clarification provided by courts after Estelle, provides a standard clear and specific enough for a reasonable official to have known whether the actions taken by the defendants in this case were unlawful. See also Clark v. Evans, 840 F.2d 876, 881 (11th Cir.1988).
 
 
 18
 The specificity of the standard is particularly important in the context of medical treatment, because the mere negligent diagnosis or treatment of a patient does not constitute deliberate indifference. Estelle, 429 U.S. at 106, 97 S.Ct. at 292. The law must therefore be clear and specific enough for the medical official to know that his actions rise to the level of deliberate indifference and are not just negligent. A medical treatment case is also unique, however, because the standard for deliberate indifference need not depend solely on prior court decisions; the contemporary standards and opinions of the medical profession also are highly relevant in determining what constitutes deliberate indifference to medical care. See Greason v. Kemp, 891 F.2d 829, 835 (11th Cir.1990); Rogers v. Evans, 792 F.2d 1052, 1058 (11th Cir.1986).
 
 
 19
 Given this combination of prior legal determinations of deliberate indifference and contemporary medical standards, there are primarily two means by which a plaintiff can demonstrate that an official's actions amounted to deliberate indifference. He or she could show that the official's actions violate the specific standards set forth and applied in Estelle and other cases prior to the incident. In other words, without further medical testimony, a plaintiff could demonstrate that the facts are similar to the facts of prior cases which found deliberate indifference. Alternately, if an official's actions required medical judgments, a plaintiff may need to do more than refer to prior cases. A plaintiff could, in such an instance, produce opinions of medical experts which assert that the official's actions were so grossly contrary to accepted medical practices as to amount to deliberate indifference. See Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir.1989).[6] This latter method of proof often is essential when a doctor's actions are at issue, because the evaluation of medical care is frequently fact-specific and dependent on medical knowledge. Although this inquiry is similar to a determination of medical negligence, the plaintiff must show far more than negligence in order to assert an eighth amendment violation. Even if the medical experts assert that the care was grossly inadequate, it remains for a court or jury to determine if the care amounts to deliberate indifference.
 
 
 20
 Relevant to the first avenue of proof, Estelle itself clarifies the hazy distinction between negligence and deliberate indifference: deliberate indifference could exist in cases where the doctors refused to treat the prisoner properly or where corrections personnel denied or delayed access to treatment. 97 S.Ct. at 291 & n. 10. The Court did not, however, find deliberate indifference in Estelle. The plaintiff had received diagnosis and treatment of his ailments, including a back injury; he complained only that the treatment and diagnosis were inadequate. The Court concluded that an alleged error in medical judgment as to what procedures to follow amounted to, at most, medical negligence, and therefore the plaintiff had not stated a cognizable claim. Thus the standard for deliberate indifference focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action.[7] Such deliberate indifference is often manifest by a refusal to act when certain actions were or should have been known to be necessary, rather than simply a failure to act. In some cases, however, if an official knows or should know that certain treatment is necessary, and he delays in providing such treatment when he reasonably should know that such delay can be hazardous, his actions could constitute deliberate indifference. Estelle, 97 S.Ct. at 291 & n. 11.
 
 
 21
 We conclude, therefore, that the law was clearly established at the time of Howell's death that if a reasonable official would have known that certain treatment was necessary, the refusal to provide or a delay in providing that treatment would constitute deliberate indifference and violate Howell's eighth amendment rights. We also find that, relevant to the actions of a medical official, if the plaintiff demonstrates that a reasonable doctor in the defendant's position would have known that his actions were grossly incompetent by medical standards, then a jury could find deliberate indifference and qualified immunity would be inappropriate.
 
 B. Defendant Mendoza
 
 22
 Dr. Mendoza was Howell's attending physician on the day of Howell's death. Although Mendoza was not Howell's usual physician, but was substituting for Dr. Youmans, he did know that Howell suffered from a serious asthma condition. Mendoza prescribed oxygen treatment and later Solu-Medrol to alleviate Howell's increasingly serious condition that day. Mendoza was not present at the hospital much of that day, however, and did not respond to two telephone pages by the nursing staff. Plaintiff alleges that Mendoza did not make entries on the patient's log at the time of the various treatments, but rather amended the logs after the fact to reflect his treatment. There is, however, no evidence that Mendoza did not in fact prescribe the treatment stated above.
 
 
 23
 We conclude that the plaintiff failed to allege that a reasonable doctor would have known that Mendoza's actions amounted to deliberate indifference under the legal or medical standards at the time of the incident. It is not disputed that Mendoza knew that Howell had a serious condition. Estelle requires, however, not merely the knowledge of a condition, but the knowledge of necessary treatment coupled with a refusal to treat properly or a delay in such treatment. Plaintiff does not contend that the oxygen treatment which Howell received was inappropriate at the time, but rather, that as Howell's condition eroded, greater treatment was required. Plaintiff thus argues that Mendoza should have known that Howell needed close attention, that he should have known that Howell's condition could deteriorate at any moment, and that Mendoza's failure to respond correctly amounts to deliberate indifference.
 
 
 24
 Even though we assume the facts as favorable to the plaintiff, none of the plaintiff's allegations meet the criteria for reasonable knowledge or deliberate indifference. We acknowledge that, from these facts, Mendoza could have committed malpractice. He left the hospital when the patient was receiving treatment for a serious illness, and he was unavailable during the day when needed. He also may not have diligently pursued alternate treatment at another hospital and may not have prescribed further treatment soon enough.[8] Yet none of these allegations rise beyond negligence to the level of a refusal to treat as outlined by Estelle.[9]
 
 
 25
 Plaintiff insists that Ancata v. Prison Health Services, 769 F.2d 700 (11th Cir.1985), guides the evaluation of deliberate indifference. Initially we observe that Ancata was decided after Howell's death and thus could not have informed officials of the relevant standards. Additionally, Ancata simply restates the law of deliberate indifference established in Estelle. In Ancata the court found that the failure of the officials, medical and correctional, to respond to obvious medical ailments such as excessive pain and swelling, which the officials knew required treatment, could amount to deliberate indifference and were sufficient to state a claim of an eighth amendment violation. The intent behind this failure to respond was evident by the officials' express refusal to obtain a medical examination unless required by court order. Howell does not assert such deliberate refusal on the part of Mendoza, and we find none in the record.
 
 
 26
 Mrs. Howell attempts to bolster her allegations against Mendoza with evidence that the medical community might condemn Mendoza's actions. To this end the plaintiff submitted an affidavit of Dr. Phillips. Phillips stated that "[i]t is my opinion that Edward M. Mendoza, M.D. failed to use the care and skill which is employed by the profession generally and, in the case of Van Howell, he deviated from the established conduct...." As evidence of these failures, Phillips refers to Mendoza's leaving the premises, his not responding to pages, his failure to transfer Howell to another facility, and his failure to prescribe proper medication in a timely manner. Nowhere does Phillips state that these actions were grossly inadequate, but only that they deviated from established standards. He does not assert that any treatment was plainly wrong, only that the treatment was not timely and that Mendoza neglected his duty. Phillips' affidavit, like the factual allegations contained in the plaintiff's brief, asserts only malpractice, not deliberate indifference.[10] The affidavit does not support an allegation that there was a clear and objective medical standard which Mendoza failed to meet and which should strip him of qualified immunity under the Harlow test. We therefore find that the district court erred in not granting Dr. Mendoza qualified immunity.
 
 C. Defendant Burden
 
 27
 Burden was superintendent of ACMI during Howell's term in prison. The issue of qualified immunity for Burden turns first on whether a reasonable person in his position as supervisor should have known that Howell needed proper treatment and that Howell should have been moved or provided with special care, and second on whether Burden's failure to do so constituted deliberate indifference.
 
 
 28
 Burden received memoranda from Drs. Youmans and Garrison in the summer of 1984 that detailed the inadequacy of Howell's medical care. ACMI could not provide Howell a diet free of sodium, could not place him in a smoke-free environment, and could not provide a respiratory therapist. Based on this and perhaps other information, Burden supported Howell's application to the Parole Board for a medical release in the summer of 1984. According to the plaintiff, the only ground offered for this recommendation was the inability of ACMI to care for Howell. Both of the memos mentioned that the Veterans Administration (VA) hospital had proper facilities.
 
 
 29
 As stated above, it was clearly established in 1984 that an official's denial of or delay in obtaining proper treatment could constitute deliberate indifference. Although Burden did recommend a medical release, according to the record before us he did not seek treatment for Howell at any other facility even though the prison's doctors had noted that such treatment was available, nor did he try to obtain proper equipment. The fact that Burden was willing to recommend release of an inmate for health reasons indicates that he knew Howell was in serious condition, and raises significant questions about why he did not pursue other measures to help Howell when the release was not granted. In July of 1984 Burden was aware of Dr. Youmans' letter stating that Howell could not receive a diet proper for his allergies at ACMI, that he could not be provided with a smoke-free environment, and that ACMI had not provided a respiratory therapist or a clinical dietician, both of which Youmans found necessary for Howell. Although there was some indication that as of November ACMI might get an air cleaner, Dr. Youmans at that time stated that no dietician was available and Howell's diet was still improper. In his report regarding Howell's death, Youmans again emphasized the failure of ACMI to obtain proper therapists. There is no indication in the record that Burden did anything to remedy the deficiency in Howell's care.
 
 
 30
 Burden argues that it was the medical staff's responsibility to provide proper treatment, not his. He contends that the medical staff did not recommend that Howell be moved, and that it was not his responsibility to obtain equipment or hire medical personnel. Although both memoranda did mention the better facilities at the VA hospital, neither suggested that Howell should be moved. Burden asserts that it was his policy to move a patient only if the doctors suggested it or security reasons required it. In his affidavit he stated that "[a]lthough I have administrative responsibility for all those working at ACMI, I do not supervise, review, or have responsibility for clinical decisions made by medical staff" (emphasis original). Essentially he claims that the medical staff's failure to recommend any changes in Howell's care relieved him of the responsibility to seek alternate care. He states that it was his policy to shift responsibility for decisions regarding moving prisoners to his medical staff.
 
 
 31
 These assertions do not absolve defendant Burden. The fact that it was his policy to seek proper treatment only when recommended by the medical personnel does not lessen his duty; an official does not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference. Indeed, it is well established that an official's policy can violate the constitution. See Wilson v. Taylor, 733 F.2d 1539, 1545 (11th Cir.1984); cf. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).[11]
 
 
 32
 We do not dispute Burden's right to rely on medical professionals for clinical determinations. Nonetheless, we observe that the clinical determinations had been made in June: Howell could not be treated under the then current conditions at ACMI. Burden had this information, as well as the information of the specific treatment Howell needed. Remaining decisions were administrative, an area Burden acknowledges was under his control. In fact, according to CMS's contract with Dr. Robinson, its medical director at ACMI, Robinson was to present all recommendations regarding improving services to Burden directly. Although Burden claims not to have been the usual person to initiate staff and equipment procurement, Howell's was not a usual situation. Burden stated in his affidavit that "[i]f there is a need for a person with specialized medical training, then that need would be identified initially by the medical administrator, who would then seek funding for such a position in the budgetary process." Burden knew of the urgent need for proper personnel to treat Howell. His apparent decision not to pursue such personnel and allow the "budgetary process" to determine whether Howell would receive necessary treatment could be found to be deliberate indifference under Estelle 's prohibition of delays in obtaining treatment. Accordingly, Burden should have known that his actions and policies could violate the eighth amendment. He is therefore not entitled to immunity, and his motion for summary judgment was properly denied.
 
 D. Defendant CMS
 
 33
 CMS provides medical services at ACMI pursuant to a contract with the Department of Corrections, a state agency. CMS hired Dr. Robinson as its Medical Director at ACMI. According to Robinson's contract and job description, he was responsible for reviewing and updating policies and procedures at ACMI, and for requesting improvements in services. Also according to the contract, he reported to the regional director of CMS and to the superintendent of ACMI (defendant Burden). He served as the health authority at the institution and was the overall administrative supervisor for clinical services.
 
 
 34
 Because of CMS's status as a private corporation contracting with the state, we must determine whether, given the allegations and facts of this case, CMS could be liable under section 1983 before we consider the issue of qualified immunity. Generally, when the state contracts out its medical care of inmates, the obligations of the eighth amendment attach to the persons with whom the state contracts. West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 2259, 101 L.Ed.2d 40 (1988). Thus, CMS can be a person acting under color of state law for the purposes of section 1983. See Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982) (if state action is established, private actor can be liable in a section 1983 action). For Howell to establish potential liability, she must do more than assert respondeat superior;[12] she must show causation. If she fails to show causation, no action can stand under section 1983, and we would not reach the issue of qualified immunity or other subsequent issues in the section 1983 analysis. Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir.1982); Jones v. Preuit & Mauldin, 851 F.2d 1321, 1330 (11th Cir.1988) (en banc) (Tjoflat, C.J., concurring). Mrs. Howell can allege causation by showing either that CMS was directly involved in the violation, or that a policy or custom of CMS led to the violation. Ort v. Pinchback, 786 F.2d 1105, 1107 (11th Cir.1986).[13]
 
 
 35
 CMS asserts that Howell failed to demonstrate any direct involvement of CMS in the care of her husband, and therefore that CMS is not liable. Direct involvement, however, is not the only basis on which liability can be found. Mrs. Howell in fact contends that it was the policy or custom of CMS, through Dr. Robinson, which led to the deliberately indifferent treatment. If Howell can demonstrate that Robinson's actions could have amounted to deliberate indifference, and that Robinson was the final authority on policy for CMS at ACMI, then a causal link would exist sufficient for potential liability under section 1983. See Wilson v. Taylor, 733 F.2d 1539, 1545 (11th Cir.1984) (city liable under section 1983 if the official making the unconstitutional decision to fire an employee had final or ultimate authority to make the personnel decisions); City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (plurality opinion) (unconstitutional policy can be inferred from a single decision by the highest official responsible for policy in that area).
 
 
 36
 Thus we must determine whether Robinson had final authority for policy at ACMI. When the party at issue is a municipality, whether an official has policymaking authority is determined by state law. Praprotnik, 108 S.Ct. at 924; Jett v. Dallas Indep. School Dist., 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). As the party at issue here is a corporation contracting with the state, the relevant "state law" for policymaking determinations are the contracts between CMS, the state, and CMS employees.
 
 
 37
 In its contract with the Department of Corrections, CMS acknowledged responsibility for liabilities arising out of its medical care of inmates. Section 8 of the contract stated:
 
 
 38
 The DEPARTMENT neither assumes nor accepts any liability for the acts or failure to act, professionally or otherwise, of CONTRACTOR, its agents or employees, or physicians provided by CONTRACTOR. CONTRACTOR neither assumes nor accepts any liability for the acts or failure to act, professionally or otherwise, of the DEPARTMENT or its agents or employees, nor will CONTRACTOR accept liability in the event any inmate is refused access to medical care by an agent or employee of DEPARTMENT.
 
 
 39
 This section acknowledges that CMS had legal responsibilities for the care of inmates. The last sentence of this section is particularly relevant. There CMS guards against liability for the refusal of access to proper care, if such refusal is not the fault of a CMS employee. This implies knowledge that, were the refusal caused by a CMS employee, CMS could be responsible.
 
 
 40
 Because CMS had responsibility for medical care, the policymaker for CMS's medical and administrative decisions becomes relevant under section 1983. CMS's contract with Dr. Robinson states at section 4(E) that Robinson shall "[r]eview and update policies and procedures, including development of policy and procedure manual." That contract also included a description of Robinson's position of Medical Director at ACMI. Robinson's "general duties" as outlined by the description were to
 
 
 41
 [serve] as the Health Authority for the institution. Provide the overall administrative supervision for clinical services at the contract facility. Attend patients, provide medical consultation for the staff and correctional executives and conduct the liaison function for clinical matters with medical providers outside the institution.
 
 
 42
 Among his "specific responsibilities" were to "Consult with the medical and dental specialists to resolve problems in their specific areas," "Supervise administratively the clinical services provided by the CMS professional and para-professional staff," and "Annually review and approve the medical protocol and clinical policies and procedures." These statements of Robinson's duties all point to the conclusion that he determined policy for CMS at the institution. Because Robinson had control over policy statements and administrative supervision of the clinical services, it appears that he was the policymaking authority for CMS at ACMI.
 
 
 43
 The determination of Robinson's policymaking authority at CMS does not end the policymaking inquiry, however. Other cases discussing policymaking involved officials who work directly for the municipality. See Praprotnik, 108 S.Ct. 915; Wilson, 733 F.2d 1539. Robinson, however, worked for CMS, which in turn worked for the state. The state divided responsibilities for policy among various officials, including the Commissioner of Corrections, the superintendent, and CMS. Thus it could be possible that even if Robinson were the policymaker for CMS, the state policy structure still required other state officials to set final policy. Again, the Robinson contract is telling. In addition to the responsibilities described above, Robinson was required to report to the superintendent. He was also required to consult with the Health Care Administrator[14] in order to make recommendations to the Warden (superintendent) for improvements in services. Under such a structure, it does not appear that Robinson could obtain necessary medical services on his own initiative, nor could his policies conclusively determine allocation of medical resources. The ultimate decision at ACMI for services would be superintendent Burden's. Although Burden asserts that his policy was to rely on medical officials' recommendations, as we have stated above these decisions were still Burden's responsibility. Burden's responsibility and authority were recognized in Robinson's contract with CMS, and this limited Robinson's ability to set final policy. We therefore conclude that as Robinson was not the final authority on the matters of equipment and staff procurement at ACMI, CMS could not be found liable, as a matter of law, for Robinson's actions and policies even though he was CMS's authority at the institution.
 
 
 44
 Because CMS cannot be found liable under section 1983 and the policy and custom provisions of Monell, we hold that the district court erred in denying CMS's motion for summary judgment.[15]
 
 IV. CONCLUSION
 
 45
 Having found jurisdiction to review the denial of summary judgment based on qualified immunity, we reverse the district court as to defendants Mendoza and Correctional Medical Systems, and affirm the district court as to defendant Burden. We remand with instructions that summary judgment be granted for Mendoza and CMS, and that the case otherwise proceed.
 
 
 46
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 
 [1]
 Robinson, who died shortly after commencement of this action, and Youmans were originally named as defendants in this action, but the claims against them were dismissed by the district court. Appellee has chosen not to contest these dismissals at this time
 
 
 [2]
 An administrative panel of this court, upon a motion to dismiss for lack of jurisdiction, held that the appeal should proceed. We construe this order as carrying the motion with the case
 
 
 [3]
 In light of this conflict, the court voted to hear en banc the decision of one panel which found jurisdiction in the face of factual disputes. Horlock v. Georgia Dep't of Human Resources, 890 F.2d 388 (11th Cir.1989). Because this case settled prior to an en banc hearing, the appeal was dismissed, and the conflict remains
 
 
 [4]
 See also Chief Judge Tjoflat's excellent analysis of these cases in Bennett v. Parker, 898 F.2d 1530, 1535-37 (11th Cir.1990) (Tjoflat, C.J., concurring)
 
 
 [5]
 A recent panel avoided this jurisdictional problem altogether. It reasoned that whether the appeal was rejected as lacking jurisdiction due to the factual dispute or the denial of summary judgment was upheld because of the factual dispute, the result was the same. Stewart v. Baldwin County Bd. of Educ., 908 F.2d 1499, 1507 n. 4 (11th Cir.1990); see also Peppers, 887 F.2d at 1496 n. 7. Although it may be true logically that the jurisdictional issue is a distinction without a difference, a prior panel did fail to rule on the specifics of the clearly established right on interlocutory appeal. See Goddard, 847 F.2d at 768 ("We acknowledge that the agents' contention that the law regarding service of subpoenas with attached 'gag orders' was not clearly established at the time of this case.... That contention is to be resolved at a later time--when the facts have been established."). In this opinion we have attempted to clarify any confusion
 
 
 [6]
 In Waldrop, the court determined that the relevant law that was clearly established at the time of the incident was the Estelle deliberate indifference standard. 871 F.2d at 1033. The court then stated that a professional medical determination that the care received was grossly inadequate could constitute deliberate indifference. Id. at 1035. The court did not inquire as to whether grossly inadequate care had been determined to be deliberate indifference prior to the incident; thus the court did not believe that such specificity was necessary under the qualified immunity standard. The court apparently found that the standards of the medical profession, combined with the legal prohibition against deliberately indifferent care, would constitute clearly established standards at the time of the incident sufficient for the Harlow qualified immunity inquiry
 
 
 [7]
 The distinction between deliberate indifference and negligence is conceptually vague because "indifference" generally implies a lack of attention by the actor similar to what the law often calls negligence. The modifier "deliberate," however, requires that the actor recklessly ignore the medical situation in the face of information that a reasonable person would know requires action
 
 
 [8]
 The record reflects that Dr. Mendoza did not administer upgraded medication earlier because he knew the patient had been on such medication quite recently. Apparently it was his medical judgment that the use of steroids should be avoided so soon after the previous use unless absolutely necessary. Although this might have been an incorrect determination, errors in medical judgment will rarely constitute deliberate indifference
 
 
 [9]
 The refusal to provide proper treatment must not be simply a medical choice but a gross violation of accepted practice. When the Supreme Court set up this standard in Estelle, it referred to two cases of grossly inadequate treatment: one where the doctor injected penicillin into a patient he knew to be allergic, the other where the doctor threw away a salvageable ear and stitched the stump. 97 S.Ct. at 291 n. 10. The actions and inactions allegedly taken by Mendoza in the present case do not compare with such shocking incidents
 
 
 [10]
 We do not hold that plaintiffs in similar cases must make sure that their medical witnesses use any "magical phrases." A court or jury can determine whether a physician's description amounts to a depiction of deliberate indifference. When the affidavit, however, employs the established terminology of negligence and presents no factual allegations which a reasonable fact-finder could credit as deliberate indifference, the affidavit cannot alone establish a violation of a clear medical standard which can defeat qualified immunity
 
 
 [11]
 Monell held that municipalities are only liable under Sec. 1983 when the violation results from an official policy or custom, and cannot be liable through respondeat superior. Appellant Burden's argument that his policy relieves him of responsibility would result in the fundamental irony that an official policy could open municipalities to liability and yet shield individual officials from similar liability
 
 
 [12]
 The district court found that CMS was liable under Sec. 1983 because CMS had a contractual duty to perform services, it hired Drs. Robinson and Mendoza to perform these duties, and "Mendoza's acts were the acts of CMS." To the extent that this rationale bases liability on respondeat superior, it was incorrect. Respondeat superior cannot be the basis for Sec. 1983 liability. Monell, 98 S.Ct. 2018; H.C. By Hewett v. Jarrard, 786 F.2d 1080, 1086 (11th Cir.1986). Because Mrs. Howell does present arguments which go beyond respondeat superior, we consider CMS's potential liability on those grounds
 
 
 [13]
 In Ort this court stated that if the prisoner/plaintiff had asserted the direct involvement of the corporation providing prison medical services in his alleged constitutional injury or had demonstrated a policy or procedure of the corporation which caused the violation, then the corporation might have been a proper party to the action. 786 F.2d at 1107. In that case, however, the plaintiff had not asserted any action connecting the corporation to his injury. We note that the analysis applied to the corporation in Ort was the same as that applied to municipalities under Monell, 98 S.Ct. 2018
 
 
 [14]
 It is unclear from the record who the Health Care Administrator was. It appears from the CMS contract with the Department that they employed this administrator along with Robinson
 
 
 [15]
 Because we find that appellee has not established the causation sufficient for liability under Sec. 1983, we need not reach the issue of whether CMS would be able to claim qualified immunity