**Leola PINKNEY, as Administratrix of the Estate of Donald L. Williams, Plaintiff,**

v.

**Leoneal DAVIS, et al., Defendants.**

Civil Action No. 95–C–1546–N.

United States District Court,
M.D. Alabama,
Northern Division.

Jan. 15, 1997.

Edward L. Hardin, Jr., Hardin & Hawkins, Birmingham, AL, James V. Green, Jr., Jill Tarte Karle, Karle & Green, L.L.C., Alabaster, AL, for Leola Pinkney.

Ellen Ruth Leonard, Andrew W. Redd, Alice Ann Byrne, Alabama Department of Corrections, Legal Division, Montgomery, AL, for Leoneal Davis, Lynn Harrelson, Regina Paige, Willie Rowell, Warden Boutwell, Jep Graham, Daniel Avant and E. Lane.

E. Martin Bloom, Randal H. Sellers, Elizabeth S. Webb, Starnes & Atchison, Birmingham, AL, for QuestCare, Inc.

J. Allen Sydnor, Jr., Huie, Fernambucq & Stewart, Birmingham, AL, for Montgomery Regional Medical Center.

## MEMORANDUM OPINION AND ORDER

CARROLL, United States Magistrate Judge.

### I.  INTRODUCTION

The plaintiff, Leola Pinkney, is the mother of Donald Williams, an inmate who died in the custody of the Alabama Department of Corrections.   In her original complaint filed in state court, she, as administratrix of his estate, sued Lynn Harrelson, the then Warden at the Kilby Correctional Facility (KCF); Leoneal Davis, the then Warden at the Draper Correctional Facility; QuestCare Incorporated, the then prison contract health care provider; and Montgomery Regional Medical Center.  The case was removed to this court and on July 29, 1996, she filed a second amended complaint which added the following additional defendants, all of whom are employees of the Department of Corrections at the Draper Correctional Facility: Sergeant Regina Paige, Captain Willie Rowell, Deputy Warden Boutwell, Jep Graham, Sergeant Daniel Avant and Sergeant E. Lane.[1] The complaint, as amended, alleges that the defendants violated the plaintiff's constitutional rights by being deliberately indifferent to a serious medical need and negligent in failing to provide him with adequate medical treatment for sarcoidosis.   The plaintiff seeks an unspecified amount of compensatory and punitive damages.   The case is currently pending before the court on motions for summary judgment filed by all of the defendants. The plaintiff does not oppose the motion filed by Montgomery Regional Medical Center. Consequently, the court's discussion will focus on the liability of QuestCare and the

---

1.  She amended her original complaint not long after she filed it but the first amendment added no new claims.

defendants who are employed by the Department of Corrections.[2]

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." This standard can be met by the movant, in a case in which the ultimate burden of persuasion at trial rests on the nonmovant, either by submitting affirmative evidence negating an essential element of the nonmovant's claim, or by demonstrating that the nonmovant's evidence itself is insufficient to establish an essential element of his or her claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The burden then shifts to the nonmovant to make a showing sufficient to establish the existence of an essential element to his claims, and on which he bears the burden of proof at trial. *Id.* To satisfy this burden, the nonmovant cannot rest on the pleadings, but must, by affidavit or other means, set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

The court's function in deciding a motion for summary judgment is to determine whether there exist genuine, material issues of fact to be tried; and if not, whether the movant is entitled to judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.,* 809 F.2d 1559 (11th Cir.1987). It is substantive law that identifies those facts which are material on motions for summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 258, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986); *see also DeLong Equip. Co. v. Washington Mills Abrasive Co.,* 887 F.2d 1499 (11th Cir.1989), *cert. denied,* 494 U.S. 1081, 110 S.Ct. 1813, 108 L.Ed.2d 943 (1990).

When the court considers a motion for summary judgment, it must refrain from deciding any material factual issues. All the evidence and the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmovant. *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The movant bears "the exacting burden of demonstrating that there is no dispute as to any material fact in the case." *Warrior Tombigbee Transp. Co. v. M/V Nan Fung,* 695 F.2d 1294, 1296 (11th Cir.1983); *see also Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With these rules and principles of law in mind, the court will determine whether summary judgment is appropriate or whether there exist genuine issues of material fact that should properly proceed to trial for resolution.

## III. DISCUSSION—THE CONSTITUTIONAL CLAIMS—QUESTCARE

### A. FACTS RELATING TO QUESTCARE

QuestCare is a private corporation which contracted with the Alabama Department of Corrections to provide medical treatment to the inmates in the Alabama prison system. Under the terms of the contract, QuestCare was required to provide reasonable and necessary health care services in accordance with all constitutional standards, the standards of the American Medical Association, the American Correctional Association, and the decisions of this court in *Newman v. Alabama* and *Pugh v. Locke.*[3]

On July 1, 1993, Mr. Williams was sentenced to serve three years in the custody of the Alabama Department of Corrections for the molestation of his 17 year old step-daughter. Following sentencing, he was housed in the Montgomery County Detention Facility to await transfer to the state prison system. He was transferred from Montgomery County to Kilby Correctional Facility (KCF) on

---

**2.** These defendants will be collectively referred to as "the correctional defendants."

**3.** At the time of the incidents which gave rise to this case, the decrees in *Newman* and *Pugh* were no longer in effect.

August 12, 1993. On August 13, 1993, Williams spoke with Amanda Andrews, an LPN employed by QuestCare, and told her "I have sarcoidosis. I am taking Prednisone, an inhaler, and an anti-depressant medication. I also take a breathing tablet." No orders for treatment or medication were given as a result of this conversation.

On August 15, 1993, Williams appeared at the KCF health care unit complaining of shortness of breath and chest pain. He again told the nurse about his illness and the medications which he was taking. Dr. James Guest, an physician employed by QuestCare to provide medical treatment to inmates at Kilby, ordered a Metrapal Inhaler for him as well as a bronchial dilator. He also prescribed Prednisone, although the dosage which he gave him was half the dosage which he had been previously receiving. Dr. Guest also placed Williams in West Ward, which is KCF's hospital wing. The next day Dr. Guest ordered two antibiotics for Williams. He ultimately received only one.

Dr. Guest examined Williams three days later, on August 18, 1993. Dr. Guest's progress notes show his understanding that Williams had been diagnosed with sarcoidosis and had been on the same dosage of Prednisone for one year. Guest, at that point, requested medical records from the Montgomery and Tuskegee VA hospitals where Williams had been previously treated. After examining Williams, Dr. Guest determined that he had sarcoidosis and an upper respiratory infection. He increased Williams's dosage of Prednisone to 20 milligrams which was the dosage he had been receiving before he entered the state prison system.

The next day, August 19, 1993, Williams was examined by Dr. George Lyrene who was QuestCare's Clinical Director. Lyrene agreed with the diagnosis of sarcoidosis, noted that Williams had a previous weight loss of 30 pounds, and also found that Williams had fluid in both lungs. He wrote no new orders.

Williams appeared at the health care unit on August 25, 1993, again complaining of symptoms related to his sarcoidosis. On that occasion, he had a temperature of 101 degrees. Dr. Guest decreased his Prednisone dosage. At this time, Dr. Guest still had not received the medical records from the VA. On September 1, 1993, Williams was again seen by Dr. Guest for complaints of breathing difficulties. A bronchial dilator was ordered and he was referred to the chronic care unit. On September 7, 1993, Williams was again admitted to the West Ward. His temperature was 102.9 degrees, his pulse was 20, and his respirations were 36. The nurses on the ward noted that he was wheezing. Dr. Guest changed Williams's Prednisone dosage to 40 milligrams every day for two days to be tapered down to no Prednisone by the end of the five day period.[4]

On September 23, 1993, Williams was transferred from KCF to Draper Correctional Facility. At the time of his transfer, his medication list included a bronchial dilator, an inhaler and Elavil. Williams was not being given Prednisone at the time of his transfer. He also had never been seen at the chronic care clinic at KCF even though Dr. Guest had referred him there on September 1 and September 8. Six days after his arrival at Draper, he appeared at the health care unit complaining of breathing problems. He was not referred to a physician.

On September 30, Williams again appeared at the Draper Health Care Unit. At that time, he told the nurses that he had sarcoidosis. He was scheduled to see a doctor on October 1 but, according to medical records, he was a "no show." There are, however, physician's orders dated October 4, 1993. The physician ordered that Williams be placed in Class II work status.[5] The physician's notes also indicated that Williams had sarcoidosis and appear to indicate that his pulmonary function should be checked. On October 12, 1993, Williams was seen by the nurse concerning "med renewal." At that time, the nurse indicated that he had a history of sarcoidosis. The physician's notes

---

4. According to the records, the plaintiff received only three of the five doses which had been prescribed.

5. Upon his arrival at Draper, Williams was placed in Class I work status and given a regular job. Class II work status is essentially light duty.

show that two tests (a "chem" profile and a CBC) were ordered and that Williams was given Ventolin, an inhaler, and another medication which the court cannot decipher in the records. He was not given Prednisone.

On October 27, 1993, Williams returned to the health care unit and complained of chest pains. He was agitated and told the nurse that he was being given the wrong kind of medication. He did not see a doctor. Williams returned to the health care unit on the 28th still complaining of chest pain. He was seen by Dr. Mendez, another QuestCare contract physician, at that time. Dr. Mendez concluded that Williams was suffering from cortochondritis and prescribed Indocin and an antibiotic. On November 8, he was given a chest x-ray. The x-ray showed that "Bibasilar Pulmonary Infiltration persists with greater involvement with the left lung."

On November 13, 1993, Ms. Pinkney became concerned about her son's condition. She arranged for her son to be seen at the VA Hospital. She had not, however, contacted prison authorities prior to making the appointment so that a security escort could be arranged. As a result, Williams did not go to the VA Hospital. On November 23, 1993, Ms. Pinkney called Leoneal Davis, the warden at Draper, asking that her son be taken to the emergency room because she was afraid that he might die. Williams's condition was discussed with Dr. Lyrene by phone. There was a discussion about the possible transfer of Williams from Draper to Staton so that he could be followed by Dr. Guest. Dr. Lyrene declined the transfer.

On November 28, 1993, at approximately 9:30 A.M., Williams appeared at the health care unit. The nurse on duty, Nancy Long, noted that:

> Inmate is emaciated looking and c/o breathing difficulties. No wheezing noted. Breath is foul smelling. Inmate states he doesn't eat because he is too weak to go to chow.

At the time of his appearance on November 28th, Williams weighed 121 pounds which was 40 pounds less than he weighed when he entered the prison system. Dr. Mendez was called at home. He ordered a Chem profile and a CBC and indicated that he would see Williams in the morning.

At 7:30 P.M., Williams returned to sick call complaining that "I have had breathing problems all day." The nurse who saw him made the following notes:

> pulse fast and regular. Skin warm, dry to touch, skin slightly pale, wheezing heard all 4 quads of lung. Too weak to get out of bed. Food was taken to bedside by officer. Inhaler used and meds taken. Hard to understand when asked. C/o pain midstern area and under each breast area. Sore to touch. Breath has foul smell.

Dr. Mendez was contacted and Dr. Lyrene was called. A decision was made to transfer Williams to Montgomery Regional Medical Center for further evaluation and that transfer was accomplished. At 8:25 P.M., Williams arrived at the medical center with a collapsed lung and a temperature of 104.1 degrees. A chest x-ray indicated that he was also suffering from pneumonia and significant malnutrition. At the time of admission he weighed 117 pounds. Despite aggressive treatment, Williams died on December 22, 1993 at the age of 35.

## B. EXPERT TESTIMONY

In support of their motion for summary judgment, the defendants have provided the testimony of Dr. James Guest, the physician who treated Williams while he was at KCF. His affidavit perfunctorily concludes that QuestCare rendered Williams appropriate treatment and was not deliberately indifferent. The plaintiff, on the other hand, has presented the testimony of two expert witnesses, Dr. Neil Farber and Nurse Jane Sullivan. Those affidavits, particularly that of Dr. Farber, identify three areas of deficiency with regard to the plaintiff's treatment. The first concerns the proper treatment for sarcoidosis. According to Dr. Farber:

> The standard care for someone suffering from sarcoidosis I is high dose Prednisone, in order to keep the condition under control. Donald Williams had been diagnosed and was being treated with steroids, with improvement in his condition, at the Veteran Affairs Medical Center until the Sum-

mer of 1993. Therefore, upon entry to both Kilby and Draper, it was required of Drs. Guest, Mendez, and Lyrene to have placed Mr. Williams on high dose Prednisone (30 to 60 mg) per day to monitor his compliance in order to stabilize the sarcoidosis. Instead, Mr. Williams was ordered lower doses of steroids at Kilby (10–20 mg per day), ordered Prednisone taper once beginning on September 7th (40 mg per day for two days, then 30 mg. per day each day for one day). At no other time were corticosteroids ordered until Mr. William's admission to Montgomery Regional Medical Center. Further, Mr. Williams compliance with drug therapy was not monitored by the medical staff at the correctional facilities which resulted in frequent breaks in therapy and in fact resulted in Donald receiving virtually no medication whatsoever in October and November of 1993.

The second area of deficiency concerns failure to address the plaintiff's nutritional status. The third concerns the failure to hospitalize the plaintiff. In Dr. Farber's words:

> It was also a breach in accepted standards of care to have failed to admit Mr. Williams to the hospital on numerous occasions while Donald resided at both Kilby and Draper, including September 6 and November 23, 1993. On both dates, Donald was showing signs of serious trouble, the September 6th date showing evidence of pneumonia (fever, pulmonary infiltrates) and respiratory distress. The standard of care requires that a patient with a severe respiratory condition such as sarcoidosis be admitted to the hospital. Similarly, during the time that Mr. William's mother was requesting for her son to be transferred, including November 23, 1993, and to a Veterans Affairs Medical Center for a November 18, 1993 appointment, Mr. Williams was severely malnourished and was deteriorating. Donald had been complaining of severe chest pain during this time period, which may have been due to a pneumothorax. Dr. Lyrene breached the standard of care when he failed to have Donald transferred.

## C. QUESTCARE'S LIABILITY

■ In *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Supreme Court held that the Eighth Amendment proscription against cruel and unusual punishment prevents prison personnel from subjecting an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106, 97 S.Ct. at 292. In this circuit, the analysis of a claim of deliberate indifference has two components: whether evidence of a serious medical need exists; if so, whether the defendants' response to that need amounted to deliberate indifference. *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir.1989). There is no doubt that the plaintiff's illness constitutes a serious medical need. The parties disagree over the question of whether the evidence, viewed as it must be in a light most favorable to the plaintiff, establishes deliberate indifference.

■ Deliberate indifference can be shown in a variety of ways. As the Eleventh Circuit has noted

> Our cases have consistently held that knowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference. Medical treatment that is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness' constitutes deliberate indifference. 'A doctor's decision to take an easier and less efficacious course of treatment' also constitutes deliberate indifference. Additionally, when the need for medical treatment is obvious, medical care that is so cursory as to amount to no treatment at all may constitute deliberate indifference. (citations omitted)

*Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir.1995). Stated in another way

> ... [t]he standard for deliberate indifference focuses on the failure to provide or allow proper treatment in the face of information which reasonably should compel action. Such deliberate indifference is often manifest by a refusal to act when certain actions were or should have been known to be necessary, rather than simply a failure to act.

*Howell v. Evans,* 922 F.2d 712, 720 (11th Cir.1991), *vacated,* 931 F.2d 711 (11th Cir. 1991), *reinstated by unpublished order* (June 24, 1991) *cited in Howell v. Burden,* 12 F.3d 190, 191 n. * (11th Cir.1994).

This case is in a peculiar procedural posture. The prison health care provider, QuestCare, has been charged with deliberate indifference because of the acts and omissions of the physicians which it employs, but none of those physicians have been named as a defendant. Nonetheless, the court believes that is appropriate to determine whether the treatment provided the plaintiff meets the constitutional standard.

■ In deciding whether the constitutional standard for delivering medical care has been breached, reference to expert testimony is appropriate. For example, because the defense of qualified immunity is intertwined with liability, a plaintiff seeking to overcome a qualified immunity defense must demonstrate that the actions of the physician "violated a clear and specific standard and that similarly situated reasonable health care providers would have known that their actions violated [the plaintiff's] constitutional right." *Adams v. Poag,* 61 F.3d at 1543. Further, according to the *Adams v. Poag* decision, the plaintiff may demonstrate the existence of a clearly established medical standard "either through reference to prior court decisions or to the contemporary standards and opinions of the medical profession." *Id.*

■ In this case, the only expert testimony which QuestCare has provided comes in the form of an affidavit from one of its contract physician's, Dr. James Guest. Dr. Guest's affidavit is extremely conclusory and provides no information to explain Williams's treatment or lack thereof. The plaintiff on the other hand has provided the court with affidavits from two experts. Both affidavits indicate that the treatment afforded Williams falls below the appropriate standard of care. It certainly appears to the court, on the present state of the record, that the medical treatment afforded Williams was below the constitutional benchmark. Williams entered the hospital with a serious and potentially fatal disease. The disease was known to the prison medical care providers from Williams's first days in the prison system. According to the affidavit of the physician presented by the plaintiff, "[t]he standard of care for a person suffering from sarcoidosis is high dose Prednisone, to keep the condition under control." There was some attempt to provide Prednisone at Kilby and there is at least a colorable argument that his treatment at that facility was simply malpractice rather than deliberate indifference. There can be no such argument for his treatment at Draper. Although the standard treatment for Williams's illness was high doses of Prednisone, there was absolutely no effort to treat him with Prednisone when he reached Draper. Indeed, from the time Williams went to Draper until the time that he was transferred to a hospital, he did not receive any dose of Prednisone. When he was seen by Dr. Mendez, no mention was made of his sarcoidosis and he was simply given Indocin and an antibiotic. In addition, it is obvious from the record before the court that Williams deteriorated significantly after he went to Draper. No one monitored his condition even though he had a serious disease which the physicians knew or should have known about and he was losing weight. It is the height of arrogance for QuestCare to suggest that there is no deliberate indifference because Williams was non-compliant with his medication. First, Williams was never provided with the appropriate medication while he was at Draper. Second, he was obviously very ill and, at least according to the plaintiffs' evidence, so ill that he could not attend pill call. Of course, under the catch–22 of this case, if Williams had shown up at pill call at Draper, the medication which he would have been given would not have helped his condition. The court has little trouble concluding on this summary judgment record that the physicians employed by QuestCare failed to provide constitutionally adequate treatment to Williams while he was incarcerated in the Alabama prison system.

Unfortunately, the court's conclusion that there was deliberate indifference does not resolve the summary judgment issue involving QuestCare. As previously noted, none of the contract physicians with QuestCare who

were involved with Williams's treatment are named as defendants. The question, therefore, is whether the plaintiff has produced sufficient evidence against QuestCare to survive summary judgment.

Under well-settled law, the plaintiff cannot predicate QuestCare's liability for the alleged constitutional violations in this case on a theory of respondeat superior. Indeed, she must demonstrate causation. If she fails to establish causation, her claim against Quest-Care fails. *Howell v. Evans,* 922 F.2d at 712. The plaintiff may show causation by demonstrating either that QuestCare was directly involved in the violation or that a policy or custom of QuestCare led to the violation. *Ort v. Pinchback,* 786 F.2d 1105, 1107 (11th Cir.1986); *Swan v. Daniels,* 923 F.Supp. 626 (D.Del.1995) (CMS is not responsible for the constitutional violations of its employees, but will be liable only if its policies or procedures are unconstitutional or are the moving force behind the constitutional violations);[6] *Unterberg v. Correctional Medical Systems, Inc.,* 799 F.Supp. 490 (E.D.Pa.1992). Because this case is before the court on a properly supported motion for summary judgment, the plaintiff bears the burden of producing some evidence to show either that QuestCare was directly involved or that a policy or custom of QuestCare led to the violation. *See Celotex Corp. v. Catrett, supra.* Unfortunately, the plaintiff has failed to do so.

The plaintiff has presented no evidence which would show that QuestCare was actually involved in the constitutional deprivations about which she complains. Thus, QuestCare's liability must arise from another source. As this circuit has noted, the analysis to be applied to the potential liability of QuestCare is the same as that applied to municipalities under the Supreme Court's decision in *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Howell v. Evans,* 922 F.2d at 724 n. 13. Under *Monell,* in order to

hold QuestCare liable for the deliberate indifference of its contract physicians and other medical personnel, the plaintiff must show that the physicians and medical personnel, in providing constitutionally inadequate treatment to the plaintiff, were implementing official Questcare policy or unofficial customary practice. *Monell,* 436 U.S. at 690–691, 98 S.Ct. at 2035–36. In addition, before liability can be imposed, the plaintiff must show that the policy or custom was the "moving force [behind] the constitutional violation." *Oklahoma City v. Tuttle,* 471 U.S. 808, 820, 105 S.Ct. 2427, 2434, 85 L.Ed.2d 791 (1985) (plurality opinion) (*quoting Polk Co. v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981)). Thus, it is clear that not only must there be some degree of "fault" on the part of QuestCare in establishing the policy or tolerating the custom, but there must be a causal link between the custom or policy and the constitutional deprivation. *Oklahoma City v. Tuttle,* 471 U.S. at 823, 824, 105 S.Ct. at 2436, 2436–37.

The plaintiff, in response to the summary judgment motion filed by the QuestCare, has not identified any policy of QuestCare which caused the constitutional violation in this case. Indeed, the principal thrust of the plaintiff's argument is that the medical treatment afforded the plaintiff was constitutionally inadequate. The plaintiff has presented no evidence which links the inadequate treatment to a policy or custom of QuestCare. Plain and simply, the plaintiff has failed to present sufficient evidence of liability on the part of QuestCare under the appropriate legal standard to avoid summary judgment. The court reluctantly concludes that the constitutional claims against QuestCare are due to be dismissed.[7]

## IV. DISCUSSION—THE CONSTITUTIONAL CLAIMS— DOC DEFENDANTS

In her original and amended complaints, the plaintiff names a series of employees of

---

6. As the *Swan* opinion also makes clear, CMS is not liable under the constitution for failing to follow the contractual standard of care it may have agreed upon with the state.

7. Throughout her brief, the plaintiff argues that the decision of the Eleventh Circuit in *Ancata v. Prison Health Services,* 769 F.2d 700 (11th Cir.

1985), mandates a ruling in her favor. The *Ancata* decision, unfortunately does not help the plaintiff. *Ancata* involved a motion to dismiss, not a motion for summary judgment and contains none of the discussions of municipal liability which are central to the resolution of the issues before the court.

the Department of Corrections as defendants. Those specifically named are:

1. E.L. Harrelson—Harrelson was the Warden at Kilby Correctional Facility at the time Williams was incarcerated there;

2. Leoneal Davis—Davis was the Warden at Draper Correctional Facility when Williams was incarcerated there;

3. Charles Boutwell—Boutwell was the Deputy Warden at Draper during the relevant time period;

4. W.G. Rowell—Rowell was the Captain at Draper in charge of security;

5. Daniel Avant—Avant is a sergeant assigned to Draper;

6. E. Lane—Lane is a sergeant assigned to Draper;

7. Jep Graham—Graham is a sergeant assigned to Draper; and

8. Regina Paige—Paige is a sergeant assigned to Draper. The court will discuss the general law applicable to the issues which the summary judgment motion presents and then discuss the liability of each defendant.

## A. LEGAL FRAMEWORK

### 1. QUALIFIED IMMUNITY—GENERALLY

■ In this circuit, there is a two step analysis for applying the qualified immunity test. First, the defendant government official must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred. Then the burden shifts to the plaintiff to demonstrate that the defendant violated clearly established constitutional law. *Zeigler v. Jackson,* 716 F.2d 847, 849 (11th Cir.1983). *See also, Hartsfield v. Lemacks,* 50 F.3d 950 (11th Cir.1995). In this case, there is no question that the correctional defendants were acting within the scope of their discretionary authority. The relevant question thus becomes whether they violated clearly established law.

■ To be clearly established, the "contours" of an asserted constitutional right "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). In addition, "pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what [the] defendant is doing violates federal law in the circumstances." *Lassiter v. Alabama A & M University,* 28 F.3d 1146, 1150 (11th Cir.1984) (en banc). As the Eleventh Circuit has noted:

> When considering whether the law applicable to certain facts is clearly established, the facts of the cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they need to be materially similar. Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases.

*Adams v. St. Lucie County Sheriff's Dept.,* 962 F.2d 1563, 1575 (11th Cir.1992) (Edmondson, J., dissenting), *approved en banc,* 998 F.2d 923 (11th Cir.1993). Stated another way, "[i]f case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant." *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1557 (11th Cir.1993), *modified,* 14 F.3d 583 (11th Cir.1994).[8]

### 2. QUALIFIED IMMUNITY—SUPERVISORY LIABILITY

■ There are two general areas of the law which are implicated by the summary judgment—supervisory liability under § 1983 and qualified immunity under § 1983. Under the decisions of this circuit, the two concepts are inextricably intertwined. Under the applicable law, supervisory liability must be predicated on something other than a theory of respondeat superior. A supervi-

---

**8.** Under the law of this circuit, a district court cannot "clearly establish" the law for qualified immunity purposes. *See Muhammad v. Wainwright,* 839 F.2d 1422, 1425 (11th Cir.1985). There is at least one panel opinion from the circuit which suggests that only Supreme Court and Eleventh Circuit precedent clearly establishes the law. *See Courson v. McMillian,* 939 F.2d 1479 (11th Cir.1991).

sor is liable only when he personally participates in the alleged constitutional violation or when "there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation and he fails to do so." *Dolihite v. Maughon By and Through Videon,* 74 F.3d 1027, 1052 (11th Cir.1996), *cert. denied,* — U.S. ——, 117 S.Ct. 185, 136 L.Ed.2d 123 (1996) (*quoting Cross v. Alabama Dept. of Mental Health,* 49 F.3d 1490, 1508 (11th Cir.1995)). In addition, a supervisor sued in his individual capacity is entitled to qualified immunity unless a reasonable supervisor would have known that his or her actions were unlawful in light of clearly established law and the information he possessed. *Greason v. Kemp,* 891 F.2d 829, 836–37 (11th Cir.1990). The liability of each of the correctional defendants will be discussed in light of this legal standard.

## B.  INDIVIDUAL LIABILITY

### 1.  WARDEN E.L. HARRELSON

█ As noted above, Harrelson was the Warden at Kilby Correctional Facility when Williams was incarcerated there. The plaintiff's case against him is based on the fact that he failed to take any action to transfer Williams to the chronic care clinic following the decision of medical personnel that such a transfer should occur.[9] The plaintiff has presented no evidence to establish why Williams was not sent to the chronic care clinic. More importantly, she has failed to present any evidence from which it could be found or inferred that Harrelson had anything to do with the lack of transfer or that he was even aware that medical personnel had determined that the chronic care clinic was appropriate treatment for Williams. As noted above, Harrelson is qualifiedly immune unless a person in his position would have known that the failure to take steps to insure that Williams went to the chronic care clinic was unlawful in light of the clearly estab-

lished law and the information he possessed. The plaintiff has failed to make that showing and the constitutional claims against Harrelson are due to be dismissed.

### 2.  WARDEN LEONEAL DAVIS

█ Davis was the Warden at Draper Correctional Facility during the period when Williams's medical treatment was constitutionally deficient. It is undisputed that he had no involvement in the treatment or lack thereof. His liability, according to the argument of the plaintiff, comes from his knowledge of Williams medical problems and his failure to take action in light of those problems. The issue of qualified immunity for Davis "turns first on whether a reasonable person in his position as supervisor should have known that [Williams] needed proper treatment and that [Williams] should have been moved or provided with special care, and second on whether [his] failure to do so constituted deliberate indifference." *Howell v. Evans,* 922 F.2d at 722.

According to the plaintiff, Davis is liable because he failed to adequately supervise the medical personnel, because he failed to develop policies concerning medical treatment, and because he failed to take action to see that the plaintiff was receiving medical treatment when he was informed of a problem on November 23, 1993. None of these contentions strip Davis of his qualified immunity.

The plaintiff attempts to make significant the fact that the prison system and its wardens are responsible for making sure that inmates receive appropriate treatment. However, there is a vast difference between making the warden responsible for the well-being of an inmate and saying that he must answer to that inmate in damages for failure to provide medical treatment. The balance between the warden's duty and his potential liability is struck by the applicable law. As noted above, the warden is liable only if he participated in the constitutional violation or if a causal connection exists between his actions and the constitutional deprivations. *Dolihite v. Maughon,* 74 F.3d at 1054. Even if there is a causal connection, he is qualified-

9. Plaintiff's brief in Opposition to the Motion for Summary Judgment, filed November 19, 1996.

ly immune unless the plaintiff shows that he would have known that his actions were unlawful in light of preexisting law and the information he possessed. *Greason v. Kemp,* 891 F.2d at 836–37.

The plaintiff has failed to present any evidence that the warden's actions or inactions caused the constitutional deprivation. Moreover, she has pointed to no case which establishes that the warden of a correctional institution has a duty to directly supervise medical staff, to set policy for the medical staff or to intervene in treatment decisions where he is not informed by medical personnel that intervention is necessary to prevent a constitutional wrong. The plaintiff's reliance on *Howell v. Evans* is misplaced. In *Howell,* the court emphasized that an administrator who is not a physician or a mental health professional may rely on the advice of medical personnel for clinical decisions. The court in *Howell* found the prison superintendent potentially liable because medical professionals had told the superintendent that the inmate who later died could not be treated at the institution. As the court noted

> We do not dispute Burden's right to rely on medical professionals for clinical determinations. Nonetheless, we observe that clinical determinations had been made in June: Howell could not be treated under the then current conditions at ACMI. Burden had this information, as well as the information of the specific treatment Howell needed. Remaining decisions were administrative, an area Burden acknowledges was under his control.

*Howell v. Evans,* 922 F.2d at 723. In this case, Davis was never told by the medical staff that Williams could not be treated at his facility. The decision in *Greason v. Kemp* is also inapposite. In that case, the court concluded that the warden of a facility where an inmate committed suicide did not have qualified immunity because he knew of the particular inadequacies of his facility, but did nothing to correct them and knew a similar incident had occurred previously but did nothing to investigate that previous incident or prevent it from happening again. *Greason v. Kemp,* 891 F.2d at 839–40. In this case, the plaintiff has not shown that Warden Davis had any particular knowledge that the medical treatment was generally inadequate. She also has not established that Davis was deliberately indifferent for failing to intervene on November 23 when he actually spoke with Ms. Pinkney about her son. Again, Davis had not been told by medical personnel that treatment was unavailable for Williams at Draper and there is nothing in the record to indicate that he had any knowledge that medical treatment was substandard or should have had such knowledge. Indeed, the record before the court causes concern about the treatment afforded Williams but does not call into question, generally, the efficacy of the treatment provided to inmates at Draper. Warden Davis's situation in this case is similar to the director of the Eufaula Adolescent Center in *Dolihite v. Maughon.* In that case, an adolescent committed to the Eufaula Center suffered serious injuries in a failed suicide attempt. The inmate had made suicidal threats and had behaved in a bizarre fashion. The court found that a social worker who was aware of the adolescent's suicidal threats and past behavior but who had failed to notify the mental health professionals at the hospital or continue protective measures was not entitled to qualified immunity. The court did conclude that the director was qualifiedly immune. In so doing, they emphasized that the administrator was not "trained in psychology, psychiatry or social work, thus [he] was not a mental health professional." *Dolihite v. Maughon,* 74 F.3d at 1054. *Dolihite* is instructive because many of the arguments that the plaintiff makes in this case for supervisory liability were rejected by the Eleventh Circuit. *See Id.* at 1054–55. Warden Davis is not a physician and there is no case which clearly establishes that he should have known that his actions concerning Williams were unlawful. Davis is also entitled to qualified immunity and the constitutional claims against him are due to be dismissed.

### 3. DEPUTY WARDEN BOUTWELL

■ The plaintiff contends that Deputy Warden Boutwell is liable because his secretary had numerous conversations with the plaintiff and because there was no policy for

dealing with such complaints. As noted above, Boutwell is the deputy warden at Draper. Janet Findley, his secretary, is the person within the prison system who had the most contact with the plaintiff. According to Ms. Findley's deposition, she had contact by phone with Ms. Pinkney about her son. Whenever Ms. Pinkney called, Ms. Findley would call the QuestCare nurse on duty to report the call and Ms. Pinkney's concerns. She also would place notes in Williams's file regarding the calls and would call Ms. Pinkney back and relay to her any information which she received. On one occasion, she discussed the phone call with Deputy Warden Boutwell. According to Ms. Findley, Ms. Pinkney called her about ten times over a two week period. The plaintiff contends that Boutwell, like Davis, made a conscious decision to separate himself from the concerns of inmate medical care. The plaintiff also argues that Boutwell is liable because he was informed, on October 17, that Williams had chest pains. The record before the court does not establish deliberate indifference on the part of Deputy Warden Boutwell. The plaintiff attempts to make a major issue out of the fact that an appointment which Ms. Pinkney had made for her son at the VA was cancelled by Ms. Findley. There is no evidence that Boutwell participated in that decision. Even if he had, however, the outcome would not be different. The most that can be said about the cancellation is that it was negligence. However, even if it could be construed as deliberate indifference, the court knows of no case where a deputy warden has been held liable because he failed to have an inmate transferred to make a free-world medical appointment under the circumstances similar to this case.

The plaintiff has leveled a significant amount of criticism at Deputy Warden Boutwell. The plaintiff has not provided the court, however, with any case which holds a deputy warden who fails to develop medical policies or fails to intervene in the treatment of an inmate when he has not been informed by professionals that such treatment is inadequate is liable for a constitutional violation arising out of that lack of treatment. She has failed to establish that Boutwell, in light of clearly established law and the information he possessed, would have known or should have known that his actions toward Williams were unlawful. Boutwell is also qualifiedly immune.

## 4. CAPTAIN W.G. ROWELL AND SERGEANT JEP GRAHAM

█ Rowell's and Graham's alleged liability relates to the incident of October 27. According to an incident report, Graham found Williams in the main hallway at Draper at about 9:25 A.M. Williams was holding his left hand over his chest and complaining of chest pains. Williams was taken to the health care unit and examined by Nancy Atkins, the nursing supervisor. Atkins reported that his vital signs were normal. Williams was given no further treatment. Minutes later, Williams walked into the team office and asked Graham to be allowed to see a doctor. Graham explained that "he had already been checked over and if the nurses deemed that he needed to see a doctor, they would schedule him to see a doctor." Williams then went to Rowell and repeated his request to see a doctor. He was not taken to see a doctor and was eventually returned to his cell.

According to the plaintiff, Rowell and Graham are "deliberately indifferent" because they failed to take Williams to see a doctor when he requested to do so. Their refusal came after a nurse had examined the plaintiff and found nothing wrong. There is no case which holds that correctional employees who refuse to take an inmate to a doctor after he has been examined by a nurse commit a constitutional violation. Rowell and Graham are entitled to dismissal of the constitutional claims against them on qualified immunity grounds.

## 5. SERGEANT PAIGE

█ In the brief which the plaintiff filed in opposition to the motion for summary judgment, the plaintiff does not make a specific argument about the liability of Sergeant Paige. Sergeant Paige, according to the evidence viewed in a light most favorable to the plaintiff, was approached by Williams on the morning of November 28, 1993. Williams

said he was hungry but had not felt like going to breakfast. Paige had the nurse across the hall come to the shift office and check him. The nurse told Williams that she would begin trying to get him moved to another facility. Paige also made arrangements for Williams to eat which eventually involved her giving money to a correctional officer so that he could purchase a fried chicken dinner and a chocolate milk shake for Williams.

Williams ate the fried chicken dinner in the shift office. While Williams was in the office, Ms. Pinkney called. Paige allowed Williams to talk with his mother. Prior to the shift change, Sergeant Paige prepared a memorandum to ensure that Williams would receive a meal tray until he was transferred. As previously referenced, it is the duty of the plaintiff to provide evidence in support of her claim against Paige in order to survive a motion for summary judgment. *See Celotex Corp. v. Catrett, supra.* There is no evidence in the record from which it could be found or inferred that Paige was deliberately indifferent and there is clearly insufficient evidence to overcome her assertion of qualified immunity. The constitutional claims against Paige are due to be dismissed.

### 6. SERGEANTS AVANT AND LANE

The plaintiff makes no specific reference to Avant and Lane in her brief in opposition to the motion for summary judgment filed by correctional defendants. The court has reviewed the record and finds that the plaintiff has failed to provide sufficient evidence to overcome their motion for summary judgment on the constitutional claims. The constitutional claims against Avant and Lane are due to be dismissed.

### V. THE STATE LAW CLAIMS

The plaintiff's complaint contains both federal and state claims. The state claims are before the court pursuant to the provisions of 28 U.S.C. § 1367 which permits a federal court to take supplemental jurisdiction over state law claims which are related to the federal claims. For the reasons discussed above, the court concludes that the federal claims are due to be dismissed. The motion for summary judgment before the court also seeks dismissal of the state law claims. The court has expressed its opinion that the medical treatment afforded the plaintiff was below constitutional standards which obviously means that the state medical malpractice claims would survive the summary judgment motion. The defendants have, however, raised a state law immunity defense. A decision by this court on the motion for summary judgment on the state law claims would necessarily involve resolution of the state law immunity defense. The state law on immunity is complex and unsettled.

Under the provisions of the applicable statute, a court may decline to exercise supplemental jurisdiction if the claim raises a novel or complex issue of state law or if the court has dismissed all of the claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(1), (3). In this case, there are complex issues of state law and all of the federal claims have been dismissed. The court, therefore, declines to exercise its supplemental jurisdiction. The plaintiff originally filed this case in state court and it was removed by the correctional defendants. It is appropriate, at this point in the litigation, to remand the case back to the state court since there is no longer any basis for this court to exercise jurisdiction. *See* 28 U.S.C. § 1447(c) (If at any time before final judgment, it appears that the district court lacks subject matter jurisdiction, the case shall be remanded).

### VI. CONCLUSION

For the foregoing reasons, it is hereby ORDERED:

(1) That the motion for summary judgment filed by Montgomery Regional Medical Center on October 21, 1996 be GRANTED and all claims against that entity be DISMISSED with prejudice; [10]

---

**10.** The court will exercise its supplemental jurisdiction for the limited purpose of dismissing all claims against Montgomery Regional Medical Center since the plaintiff does not oppose that action. As referenced above, the court declines to exercise supplemental jurisdiction over the state law claims against the other defendants.

(2) That the motion for summary judgment filed by QuestCare, Inc. on October 23, 1996 be GRANTED insofar as it seeks dismissal of the federal claims and that all federal claims against QuestCare be DISMISSED with prejudice. The case will be remanded to the state court for resolution of the state law claims;

(3) That the motion for summary judgment filed by Harrelson, Davis, Boutwell, Rowell, Graham, Paige, Avant and Lane on October 24, 1996 be GRANTED insofar as it seeks dismissal of the federal claims and that all federal claims against these defendants be DISMISSED with prejudice. This case will be remanded to the state court for resolution of the state law claims; and

(4) That the clerk take all steps necessary to remand this case to the Circuit Court of Montgomery County, Alabama, on or before seven days from the entry of this order.