Lauren Elmore McELLIGOTT, as Executrix of the Estate of Thomas Elmore, Plaintiff-Appellant,

v.

Michael G. FOLEY, Sharon Wagner, et al., Defendants-Appellees.

No. 98-3451.

United States Court of Appeals,

Eleventh Circuit.

Aug. 3, 1999.

Appeal from the United States District Court for the Northern District of Florida. (No. 3:97-CV-281-LAC), Lacey A. Collier, Judge.

Before BARKETT, Circuit Judge, and KRAVITCH and MAGILL[*], Senior Circuit Judges.

BARKETT, Circuit Judge:

Appellant Lauren Elmore McElligott, the administrator of the estate of Thomas Elmore, appeals from the district court's grant of summary judgment to Okaloosa County, Dr. Michael Foley, and head nurse Sharon Wagner on Elmore's claim that the medical care he received in jail violated the Eighth Amendment.[1] McElligott argues that the district court erred in concluding that defendants were not deliberately indifferent to Elmore's serious medical needs and awarding them qualified immunity. We reverse and remand for further proceedings on Elmore's claim against Dr. Foley and nurse Wagner in their individual capacity, but affirm the grant of summary judgment to Okaloosa County.

BACKGROUND

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party. Those facts indicate that, on August 4, 1996, Elmore was incarcerated at the Okaloosa County Jail. On his entry into the prison system, Elmore had experienced burning abdominal pains for approximately five months. Nurse Lynda Barrow pointed out this history on her assessment of

---

[*]Honorable Frank J. Magill, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]Elmore initially filed suit in his own name. However, he died while this litigation was pending and McElligott, his daughter and the administrator of his estate, was substituted as plaintiff.

Elmore, and nurse Sharon Wagner, the head and only registered nurse at the jail, approved Barrow's evaluation and noted that Elmore should be brought to medical on an "as needed" basis due to his history of stomach problems. Dr. Foley, the sole jail physician, signed off on the nursing staff's initial assessment of Elmore's stomach problems but did not examine him at the time he entered the jail. Dr. Foley spends only three to four hours per week at the jail. Consequently, Dr. Foley only sees patients with particularly urgent problems. Because Foley spends so little time at the jail, he depends on the jail's nurses to determine which inmates need his time most and to respond to inmate requests directed to him.

After his incarceration on August 4, Elmore began experiencing severe abdominal pain, vomiting, and nausea, telling jail medical staff that his abdomen was cramping and "on fire." On August 10, he was examined by nurse Roberta Eastman and placed on a liquid diet and given pepto-bismol. Both Dr. Foley and nurse Wagner were notified of Elmore's symptoms. Although Dr. Foley visited the jail several days later, he again did not see Elmore, explaining that his symptoms had improved and that "it did not appear he was ill enough for me to see him."

On September 1, 1996, nurse Wagner received a telephone call at 3:00 A.M. from one of the jail nurses, who reported that Elmore had severe intestinal pain and had vomited several times. The medical records indicate that Elmore was still vomiting one-half hour later. Elmore's pain persisted throughout the morning and, after making morning rounds, nurse Barrow telephoned Dr. Foley. Despite not having examined Elmore, Dr. Foley prescribed a liquid diet, tylenol for pain, and pepto-bismol for nausea, vomiting, and diarrhea. Later that day, Elmore told the jail nurses that he still felt severe pain in his stomach, describing the pain as a knot in his stomach which someone is turning, and that his vomit had a foul odor of stool.

On September 3, 1996, Dr. Foley examined Elmore for the first time. Dr. Foley was aware that Elmore was in severe pain, observing that "when I touched his abdomen just with the tip of my finger, he became rigid, clenched his fist as if I was causing him some really severe acute pain." Dr. Foley also noted that Elmore's feces had a foul smell. Dr. Foley ordered blood work and a urinalysis and prescribed Bentyl, an anti-gas medication. Dr. Foley also requested records from Elmore's prior treatment at a Veterans

Administration hospital in Atlanta. Elmore took this medication for approximately one month, at which time Dr. Foley ordered that the prescription not be refilled. The Bentyl relaxed his stomach, and, at least for a small period of time, eased his pain. However, after a short period without pain, the pain began to recur and worsened once the medication ran out. Elmore filed a number of inmate request forms, but these forms never made it into Elmore's medical file and were apparently lost or not acted upon.

On October 22, 1996, Elmore wrote an inmate request form to nurse Wagner, explaining that the stomach pain had increased and was getting stronger, harder, and more frequent and that he needed to get back on medication before the pain became unbearable. On October 23, 1996, Dr. Foley examined Elmore for a second time. He described Elmore's abdominal pain "as an ache that goes all the way through." Dr. Foley once again placed Elmore on Bentyl, the anti-gas medication, ordered another urinalysis, and follow up for a week later if Elmore did not improve. Although Elmore continued to report pain to the staff nurses, Dr. Foley did not see Elmore until more than a month later, on December 3, 1996.

During this period, on November 27 and December 1, Elmore wrote inmate request forms to Dr. Foley begging him for medication to relieve the pain. On November 27, Elmore filled out an inmate request form, indicating that his stomach pains and nausea "are getting severe." In block letters, he pleaded, "NEED MEDICATION AGAIN!!" When Dr. Foley did not respond, Elmore sent another request form to Dr. Foley on December 1, writing in large capital letters, "NEED HELP IN SEVERE PAIN!" During this time, Elmore was having severe stomach cramps, muscle spasms, and was having trouble digesting food as well as vomiting. Dr. Foley examined Elmore for the third time on December 3, 1996. Dr. Foley, having been told of the pain that Elmore was experiencing, decided to continue prescribing only the medication for gas, Bentyl. He did not perform any further diagnostic tests at the time, choosing to wait to see the records from Elmore's admission to the VA Hospital in Atlanta, and simply asked the nurses to request the VA records again.

After being examined by Dr. Foley on December 3, Elmore continued to be in pain and experience other symptoms, yet had a difficult time even in obtaining the only medication that had been prescribed, his Bentyl medication. He filed several inmate request forms, pleading with nurse Wagner, Dr. Foley, and the

other staff nurses to deliver the medication more than twice a day. Elmore continued to complain that he was experiencing pain, was unable to eat, and that the medication was not effective, noting on an inmate request form filed on December 29 that he was still having muscle spasms and gas and that the Bentyl was not as effective as it had been in the past in relaxing his stomach.

Dr. Foley did not examine Elmore again until January 9, 1997. Dr. Foley recognized that Elmore continued to suffer from pain, muscle spasms, continual vomiting, and was beginning to lose weight and that the Bentyl medication was not helping Elmore. Nevertheless, Dr. Foley continued Elmore's Bentyl medication and also prescribed Reglan, a medication used to promote the increased motion of food through the gastrointestinal tract. However, Dr. Foley still did not prescribe anything to address the pain Elmore was experiencing.

On January 21, 1997, Elmore submitted an inmate request form addressed to Dr. Foley, asking to see him and stating that "[m]edicine is not helping condition. Seems to be getting worse. Can't eat. In pain almost all the time! Already lost 15 lb. Weak from no nourishment." Elmore also stated, "I feel like I'm dying." Dr. Foley did not see or prescribe any other medication for pain or otherwise. One week later, on January 28, Elmore filed another request to see Dr. Foley, stating that his condition was getting yet worse. At this time, Elmore spoke to his daughter, McElligott, telling her that he thought he was dying and would not make it out of the jail alive. She attempted to contact the director and deputy director of the jail. She spoke with Larry Caskey, the deputy director of the jail, who told her that he "would stay on top of the situation." Larry Caskey also called nurse Wagner, telling her to look into Elmore's care. However, it does not appear that nurse Wagner ever did so.

On that same day, January 28, Dr. Foley once again examined Elmore. Although Elmore had not been eating solid foods for some time, causing him to lose a significant amount of weight, Dr. Foley did not order any further examinations, choosing again to continue to wait until the VA hospital records arrived. Dr. Foley discontinued Elmore's use of Bentyl and Reglan, recognizing that they were not working, and prescribed Prilosec, a medication for ulcers, believing that Elmore might be having trouble with ulcers. Dr.

Foley, however, did not confirm this belief through further diagnostic testing. Nor did he prescribe anything for pain.

On February 2, a correctional officer brought Elmore into the medical department, where he was examined by nurse Parsons. She noted in the records that he was vomiting and that he was pale and thin. His weight was down to 128 pounds and Dr. Foley testified that, at this point, it was apparent that Elmore's condition had deteriorated considerably. On the next day, nurse Barrow noted that Elmore could not even tolerate liquids. On February 4, McElligott spoke with Okaloosa County Commissioner Bill Harrison. Shortly after they spoke, the Director of the jail, Bill Curry, informed her that Dr. Foley had been paged and directed to see Elmore. The jail staff beeped Dr. Foley, advising him that "administration would like you to see Mr. Elmore today." Foley ordered blood and urine work to be performed on Elmore before his arrival at the jail. At this time, the jail had received the VA records. Dr. Foley saw that Elmore was in severe pain, was likely dehydrated, was not eating, had lost almost twenty pounds in two months, and had a possible diagnosis of cancer. Dr. Foley, however, did not give any instructions to have Elmore hospitalized, placed on IV fluids, or have anyone watch over him. On February 5, Dr. Foley ordered a CT scan and a chest x-ray. Apparently nothing else was done until the test results returned.

On February 10, after receiving the results of the testing, which indicated an intestinal obstruction, Elmore was hospitalized at the North Okaloosa Medical Center. Weak and emaciated, Elmore was given demerol for pain. That same day, nurse Wagner estimated that the cost of hospitalization would be approximately $8,000-15,000 or higher. The next day, Elmore was prematurely released from the jail and was discharged from the hospital without diagnosis two days later. Several days later, he was admitted to the VA Hospital in Atlanta and was diagnosed with terminal cancer.

On June 18, 1997, Elmore filed this action alleging that the County, Dr. Foley, and nurse Wagner had acted with deliberate indifference to Elmore's serious medical needs in violation of the Eighth Amendment's ban on cruel and unusual punishment. On September 15, 1998, the district court granted summary judgment to the defendants, concluding that Elmore's allegations, even if true, did not establish deliberate indifference

on the part of the defendants. Accordingly, the district court concluded that Dr. Foley and nurse Wagner were entitled to qualified immunity. This appeal followed.

## DISCUSSION

In reviewing the district court's grant of summary judgment, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert,* --- U.S. ----, ----, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999); *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 1714 n. 5, 140 L.Ed.2d 1043 (1998).

### I

It is well settled that the "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 182-83, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). However, not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105, 97 S.Ct. 285. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106, 97 S.Ct. 285. "In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.*

In *Estelle,* the Supreme Court established the "deliberate indifference" standard. The meaning of that term was further clarified by the Supreme Court in *Farmer v. Brennan,* 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), a case that considered its meaning with reference to a prison's duty to protect its inmates from violence at the hands of other inmates. In *Farmer,* the Court held that "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless

the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. However, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that a harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id.* at 842, 114 S.Ct. 1970. Further, "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*

Accordingly, under *Estelle* and *Farmer,* deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. Therefore, "summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: 'since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.' " *Campbell v. Sikes,* 169 F.3d 1353, 1364 (11th Cir.1999) (quoting *Steele v. Shah,* 87 F.3d 1266, 1269 (11th Cir.1996)). Likewise, in addition to the subjective awareness of the relevant risk, *Estelle* requires that plaintiff show more than mere negligence to establish a violation of the Eighth Amendment and defeat a prison official's motion for summary judgment.

Our cases have given substance to *Estelle* 's distinction between "deliberate indifference" and mere negligence, explicating categories of action or inaction that may constitute deliberate indifference. We have repeatedly found that "an official acts with deliberate indifference when he or she knows that an inmate is in serious need of medical care, but he fails or refuses to obtain medical treatment for the inmate." *Lancaster v. Monroe County, Ala.,* 116 F.3d 1419, 1425 (11th Cir.1997); *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir.1989) (noting that "knowledge of the need for medical care and intentional refusal to provide that care

constitute deliberate indifference"). Even where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours, though the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable. *See Harris v. Coweta County,* 21 F.3d 388, 393-94 (11th Cir.1994); *Brown v. Hughes,* 894 F.2d 1533, 1537-39 (11th Cir.1990). We have also held that deliberate indifference may be established by a showing of grossly inadequate care as well as by a decision to take an easier but less efficacious course of treatment. *See Steele v. Shah,* 87 F.3d 1266, 1269-70 (11th Cir.1996); *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989). Moreover, "[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." *Mandel,* 888 F.2d at 789; *Ancata v. Prison Health Servs., Inc.,* 769 F.2d 700, 704 (11th Cir.1985).

## II

With these principles in mind, we turn to the parties' contentions. McElligott argues that there was sufficient evidence in the summary judgment record to show that Dr. Foley and nurse Wagner, despite knowing of a substantial risk of harm to Elmore, were deliberately indifferent to Elmore's serious medical needs.[2] We agree.

There was sufficient evidence in the summary judgment record to show that defendants acted with deliberate indifference as that term as been defined in *Farmer* and our cases. First, as detailed above, there can be little question that there was sufficient evidence to permit a jury to infer that the defendants in this case knew of a substantial risk of harm to Elmore. Second, there was sufficient evidence to permit a jury to draw the conclusion that Dr. Foley and Wagner were not merely negligent in the care that they provided Elmore, but knowingly provided grossly inadequate, and at times no care to Elmore.

The record in this case permits a jury to infer that Dr. Foley and nurse Wagner were aware of a substantial risk of harm to Elmore. Although Dr. Foley did not diagnose Elmore's condition as cancer and

---

[2]The parties do not question that Elmore's medical needs were serious. They only dispute whether the defendants acted with deliberate indifference to those needs.

did not know that he had cancer, a jury could find that Dr. Foley and Wagner were aware of the tremendous pain and illness that Elmore was suffering from at the very outset of his incarceration. Dr. Foley's examinations, infrequent as they were, as well as Elmore's nearly constant complaints about the pain he was having, addressed to both Dr. Foley and nurse Wagner, were sufficient to create a question for the jury whether Foley and nurse Wagner were aware of a substantial risk of harm to Elmore. Indeed, Dr. Foley's notes from his examinations, as well as his deposition testimony, reflect that he was aware that Elmore was suffering from serious abdominal pain. Further, given the extent of the deterioration and weight loss that Elmore faced in his last months at the jail, the risk of harm to Elmore was obvious, permitting a jury to infer knowledge of a substantial risk of serious harm. Finally, in early February, 1997, Okaloosa County administration, after Elmore's sister's complaints to the County Commissioner, notified both Dr. Foley and Wagner of the need to look into Elmore's care. Given the totality of circumstances described above, a jury could conclude that Dr. Foley and Wagner were aware that Elmore was vitally in need of medical treatment to address his pain. Foley argues that he did not know that Elmore faced a substantial risk of harm. He may be able to persuade a jury that he did not know of a risk of serious harm to Elmore, but there is sufficient evidence to support a jury finding that he had the requisite subjective knowledge.[3] This case is thus a far cry from *Campbell,* where we affirmed the grant of summary judgment because there was no evidence that the psychiatrist knew of a substantial risk of serious harm to the inmate as a result of the course of his treatment. *Campbell,* 169 F.3d at 1367-72.

The closer question in this case is whether the evidence in the summary judgment record would permit a jury to conclude that the care received by Elmore was so inadequate that defendants violated the Eighth Amendment. We agree with the district court that Dr. Foley and Wagner cannot be held liable for failing to diagnose Elmore's colon cancer. While that failure to diagnose can be deemed extremely negligent, it does not cross the line to deliberate indifference. However, we think the district court's grant of summary

---

[3]It is true that Dr. Foley denied receiving some of the inmate request forms filed by Elmore. However, Dr. Foley testified that the jail nursing staff usually informs him verbally of developments with patients. A jury could conclude that although Dr. Foley did not see the forms themselves, he was told of their contents by the nursing staff.

judgment was in error because there was sufficient evidence to permit a jury to conclude that Dr. Foley and nurse Wagner were deliberately indifferent to Elmore's medical need for further diagnosis of and treatment for the severe pain he was experiencing.

A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness. In *Estelle,* the Supreme Court recognized that the Eighth Amendment requires the government "to provide medical care for those whom it is punishing by incarceration" precisely because the failure to do so "may actually produce physical 'torture or a lingering death' " or, "[i]n less serious cases, ... may result in pain and suffering which no one suggests would serve any penological purpose." *Estelle,* 429 U.S. at 103, 97 S.Ct. 285 (quoting *In re Kemmler,* 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890)).

Our cases, too, have recognized that prison officials may violate the Eighth Amendment's commands by failing to treat an inmate's pain. In *Brown v. Hughes,* 894 F.2d 1533 (11th Cir.1990), we recognized that the delay of a few hours in treating an inmate's broken foot could constitute a violation of the Eighth Amendment, holding that the failure to treat the pain from a broken foot, even for a few hours, was a constitutionally cognizable injury. "With this type of injury, it may be that deliberately indifferent delay, no matter how brief, would render defendants liable as if they had inflicted the pain themselves. Deliberately inflicted pain, as with an electric cattle prod, does not become unimportant and unactionable under the eighth amendment simply because the pain produced is only momentary." *Id.* at 1538; *Washington v. Dugger,* 860 F.2d 1018, 1021 (11th Cir.1988) (reversing grant of summary judgment to prison officials on inmate's claim that delay in providing treatments that "eliminated pain and suffering at least temporarily" constituted deliberate indifference); *Aldridge v. Montgomery,* 753 F.2d 970, 972-73 (11th Cir.1985) (reversing directed verdict to officers who failed to provide ice pack and aspirin for pain caused by bleeding cut); *see also Ralston v. McGovern,* 167 F.3d 1160, 1162 (7th Cir.1999) (reversing grant of summary judgment to prison guard who failed to provide pain medication to inmate); *Boretti v. Wiscomb,* 930 F.2d 1150, 1154-55 (6th

Cir.1991) (recognizing that "a prisoner who suffers pain needlessly when relief is readily available has a cause of action against those whose deliberate indifference is the cause of his suffering.").

In light of these principles and the summary judgment record, the district court erred in finding that the facts, viewed in the light most favorable to the plaintiff, did not establish deliberate indifference to Elmore's serious medical needs. Despite the repeated complaints about the pain he was suffering from, a jury could find that Dr. Foley and nurse Wagner basically did nothing to alleviate that pain, essentially letting Elmore suffer even as his condition was deteriorating. Other than tylenol and pepto-bismol, the main medication Elmore received was an anti-gas medication, Bentyl.[4] Insofar as Elmore's pain was concerned, a jury could find that the medication provided to Elmore was so cursory as to amount to no care at all. A jury could conclude that, despite being aware that the medication prescribed for Elmore was not treating the severe pain he was experiencing, Dr. Foley and Wagner did nothing to treat Elmore's pain or respond to the deterioration of his condition. *See Ancata,* 769 F.2d at 704. "A jury could infer deliberate indifference from the fact that [Dr. Foley] knew the extent of [Elmore's] pain, knew that the course of treatment was largely ineffective, and declined to do anything more to attempt to improve [Elmore's] condition." *Hathaway v. Coughlin,* 37 F.3d 63, 68 (2d Cir.1994); *see also West v. Keve,* 571 F.2d 158, 162 (3d Cir.1978) (finding that inmate stated a claim for deliberate indifference based on denial of post-operative pain medication; although plaintiff was provided with aspirin, "this may not constitute adequate medical care")(*cited in Ancata,* 769 F.2d at 704).[5]

Despite Elmore's condition, a jury could conclude that, rather than try to diagnose and treat Elmore's worsening condition, the defendants knowingly took an "easier but less efficacious course of treatment," *Waldrop,* 871 F.2d at 1035, reflecting their deliberate indifference to the pain and suffering he was

---

[4]He did receive two other medications, Reglan and Prilosec. However, neither of these medications were designed to address the severe abdominal pain that Elmore was experiencing. As noted earlier, Reglan is a medication designed to increase the motion of food through the gastrointestinal tract and Prilosec is a medication for ulcers.

[5]Although it is true that the Bentyl prescribed by Foley did help Elmore for a period of time, a jury could conclude that, after this period, the Bentyl was not helping Elmore's pain and that Dr. Foley knew that the medication was not working and that Elmore's condition was deteriorating, but did not respond.

experiencing. Even the care they did provide often came after significant delays. For example, Elmore often had to wait in great pain in order even to be seen by Dr. Foley.[6] A jury could find that these delays evidence the defendants' deliberate indifference.[7] Finally, a jury could also find deliberate indifference in defendants' failure to do anything to alleviate Elmore's pain or even monitor his condition from February 5—February 10, 1997, when Dr. Foley finally decided to order much-needed and long-overdue testing for Elmore.

A similar situation was present in *Carswell v. Bay County,* 854 F.2d 454 (11th Cir.1988). In *Carswell,* the plaintiff made a series of requests for medical care and attention. Although the medical staff diagnosed and provided some medication to the plaintiff, we nonetheless affirmed a jury verdict for the plaintiff, explaining that, because plaintiff's condition worsened and the jail medical staff failed to respond, "with evidence of knowledge the jury could have concluded that the failure to provide Carswell with medical care constituted deliberate indifference." *Id.* at 457. As in *Carswell,* a jury in this case could find that, although Dr. Foley and Wagner provided some medication to Elmore, as Elmore continued to feel severe pain and as his condition deteriorated, Dr. Foley and Wagner, with knowledge of Elmore's condition, failed to provide care in response to his needs. The fact that Elmore was ultimately hospitalized does not change matters; the same was true in *Carswell* yet we still upheld the jury's verdict.[8]

---

[6]For example, on several occasions, Elmore, after writing requests to see Dr. Foley, had to wait a week or more in order to receive medical attention. On November 27, 1996 and December 1, 1996, Elmore requested medication from Dr. Foley for pain, but Dr. Foley did not respond for days—until December 3. Likewise, on January 21, 1997, after Elmore's condition had deteriorated further, he had to wait a week before Dr. Foley came to examine him again. Although Elmore's needs were not so serious that a delay of a day or so would have been constitutionally intolerable, the week long delays he endured, a jury could conclude, were the product of deliberate indifference. *See Harris,* 21 F.3d at 393-94.

[7]Dr. Foley suggests that these delays occurred because of decisions by the nursing staff. However, Dr. Foley set up the system in which the nursing staff responds, without review by Dr. Foley, to requests to see him. Under our law, "an official does not insulate his potential liability for deliberately indifferent actions by instituting a policy of indifference." *Howell v. Evans,* 922 F.2d 712, 723 (11th Cir.1991).

[8]There is another parallel between this case and *Carswell* that is worth noting. In *Carswell,* defendants failed to diagnose plaintiff's illness as diabetes. Although we found no Eighth Amendment violation in this failure, we nevertheless held that defendants were deliberately indifferent to plaintiff's serious medical needs for failing to respond to his deteriorating medical condition. Thus, the fact that defendants may not be held liable for failure to diagnose Elmore's cancer does not preclude a finding that defendants were deliberately indifferent for failing to provide pain medication to Elmore.

We reject Dr. Foley's argument that summary judgment was appropriate because Dr. Foley provided medical care to Elmore. "It is ... true that when a prison inmate has received medical care, courts hesitate to find a Eighth Amendment violation." *Waldrop,* 871 F.2d at 1035. However, Dr. Foley simply misstates the controlling law when he argues that his provision of medical care to Elmore precludes an Eighth Amendment claim. "Hesitation does not mean, however, that the course of a physician's treatment of a prison inmate's medical or psychiatric problems can never manifest the physician's deliberate indifference to the inmate's medical needs. We reaffirm ... that grossly incompetent medical care or choice of an easier but less efficacious treatment can constitute deliberate indifference." *Id.*

This case is quite different than *Adams v. Poag,* 61 F.3d 1537 (11th Cir.1995), and *Howell,* the cases on which Dr. Foley primarily relies. In *Adams,* we held that the plaintiff's part-time jail physician was not deliberately indifferent. We held that plaintiff's claim—that the physician "did not diligently pursue alternative means of treating [plaintiff's] condition"—"did not 'rise beyond negligence to the refusal to treat as outlined by *Estelle.*' " *Adams,* 61 F.3d at 1546 (quoting *Howell,* 922 F.2d at 721). Likewise, in *Howell,* we found that plaintiff's allegations did not rise above the level of negligence. The plaintiff in *Howell* did not argue that the treatment provided by the defendant was inappropriate, but that the defendant should have known that plaintiff's condition *could* deteriorate and, consequently, should have monitored the plaintiff closely. We rejected this argument, explaining that

> none of the ... allegations meet the criteria for reasonable knowledge or deliberate indifference. We acknowledge that ... [the defendant] could have committed malpractice. He left the hospital when the patient was receiving treatment for a serious illness, and he was unavailable during the day when needed. He also may not have diligently pursued alternate treatment at another hospital and may not have prescribed further treatment soon enough. Yet none of these allegations rise beyond negligence to the level of a refusal to treat....

*Howell,* 922 F.2d at 721. Further, the plaintiff's medical testimony did not "state that [defendant's] actions were grossly inadequate, but only that they deviated from established standards," *id.* at 722, reinforcing the notion that the claim was only one of mere negligence.

The crucial difference between this case and *Howell* is that here plaintiff does not allege that the defendant should have known that deterioration of plaintiff's condition was possible, but that the defendant

was aware that plaintiff's condition was, in fact, deteriorating, and still did nothing to treat this deteriorating state. This makes the case more akin to *Carswell* and distinguishable from *Howell*. Further, unlike *Adams* and *Howell,* this case does not involve a claim that different treatment should have been provided, which is tantamount to a medical judgment call, but that the treatment provided was grossly inadequate, amounting to no treatment at all.

Accordingly, because there was sufficient evidence to support an Eighth Amendment claim, the district court erred in granting summary judgment to Dr. Foley and Wagner. However, we affirm the district court's grant of summary judgment to Okaloosa County. McElligott has not shown that a county policy or custom was the "moving force" that caused the alleged constitutional violations in this case as she must to establish the county's § 1983 liability. *See Young v. City of Augusta, Ga.,* 59 F.3d 1160, 1171 (11th Cir.1995).

Foley contends that, notwithstanding any constitutional violation, he is entitled to qualified immunity. In response, McElligot argues that the recent Supreme Court case of *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), precludes Foley and Wagner from raising qualified immunity as a defense. We need not resolve the question of *Richardson* 's applicability to the instant case, however, because we find the Eighth Amendment doctrine governing the outcome of this case to have been clearly established at the time of the events in question. Thus, even if Foley were entitled to qualified immunity, it would be of no help to him here.

Qualified immunity is a guarantee of fair warning. Under the doctrine of qualified immunity, a government official sued for damages for injuries arising out of the performance of discretionary functions must be "shown to have violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Conn,* 119 S.Ct. at 1295 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). As the Supreme Court has explained, "qualified immunity seeks to ensure that defendants 'reasonably can anticipate when their conduct may give rise to liability,' by attaching liability only if '[t]he contours of the right [violated are] sufficiently clear that a reasonable official would

understand that what he is doing violates that right.' " *United States v. Lanier,* 520 U.S. 259, 270, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful; but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citations omitted).

This standard has been met in this case. Well before the actions here, we established the Eighth Amendment principles that govern this case. Indeed, virtually all the precedents cited to support our conclusion that there was sufficient evidence for a jury to conclude that Dr. Foley and Wagner were deliberately indifferent to Elmore's serious medical needs were decided before this case arose. Given the abundance of caselaw from our circuit defining the parameters of deliberate indifference, we cannot say that defendants lacked fair warning that their conduct violated the Eighth Amendment. *See Harris,* 21 F.3d at 393 ("The contours of the legal norms on deliberate indifference to medical needs have been subsequently evolving, and the particularity that [qualified immunity doctrine] requires has been given force by many reported cases testing the boundaries and details of deliberate indifference...."). Indeed, as noted above, *Carswell,* a case decided almost a decade before the events in this case, bears close resemblance to the facts of this case.

Our circuit precedent makes clear that no more is required to strip Dr. Foley and Wagner of the qualified immunity protections they might otherwise enjoy.[9] In *Greason v. Kemp,* 891 F.2d 829 (11th Cir.1990), we said that "one simply cannot say that a prisoner has a clearly established right to adequate psychiatric care but that that right is not violated by a particular treatment amounting to grossly inadequate care unless some prior court has expressly so held on 'materially similar' facts. Such an approach would add an unwarranted degree of rigidity to the law of qualified immunity." *Id.* at 834 n. 10. *See also Hill v. Dekalb Regional Youth Detention Ctr.,* 40 F.3d 1176, 1186 (11th Cir.1994) (" 'A finding of deliberate indifference

---

[9]Although we reiterate that in so finding we take no position on the question whether, as McElligot argues, *Richardson v. McKnight,* 521 U.S. 399, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), would indeed foreclose Foley and Wagner from claiming the protection of qualified immunity.

necessarily precludes a finding of qualified immunity;  prison officials who *deliberately* ignore the serious medical needs of inmates cannot claim that it was not apparent to a reasonable person that such actions violated the law.' ") (quoting *Hamilton v. Endell,* 981 F.2d 1062, 1066 (9th Cir.1992) (emphasis in original)).

Accordingly, the judgment of the district court is AFFIRMED IN PART AND REVERSED IN PART and case is REMANDED for further proceedings consistent with this opinion.